741 A.2d 1162

**James Edward PERRY**

v.

**STATE of Maryland.**

**No. 23, Sept. Term, 1999.**

Court of Appeals of Maryland.

Dec. 10, 1999.

38

R. Rene Dupuy, Washington, DC (William Jordan Temple, Alexandria, VA, on brief), for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL, and ROBERT L. KARWACKI (retired, specially assigned), JJ.

WILNER, Judge.

Appellant, James Perry, was convicted by a jury in the Circuit Court for Montgomery County of three counts of premeditated murder and one count of conspiracy to commit murder. For the three murders, Perry was sentenced to death. A separate sentence of life imprisonment was imposed for the conspiracy.

The convictions arose from the murders of Mildred Horn, her eight-year-old disabled son, Trevor Horn, and Trevor's nurse, Janice Saunders. The murders occurred in Mildred Horn's home in Rockville, in the early morning hours of March 3, 1993. Ms. Horn and Ms. Saunders were shot in the head; Trevor died of asphyxia—his air supply had been cut off by suffocation. The State's evidence, the sufficiency of which has never been challenged by Perry, was that Perry was a hired killer, that he committed the murders as part of a conspiracy with Lawrence Horn, Mildred's former husband and Trevor's father, and that Lawrence Horn's motive in arranging for the murders was to collect approximately $1 million from a trust that had been established for Trevor from the proceeds of a personal injury claim. Lawrence Horn was tried separately and convicted for his role in the matter.

In his direct appeal from the three convictions and sentence of death, Perry raised a number of issues, all but one of which we rejected on the merits. *Perry v. State,* 344 Md. 204, 686 A.2d 274, *cert. denied,* 520 U.S. 1146, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997). The one issue that we did not address but left for further development in a post-conviction proceeding concerned the admission into evidence of a 22–second taped telephone conversation between Perry and Horn and testimony identifying the voices on that tape. Upon denial of relief by the Supreme Court, Perry filed a petition for post-conviction relief in the Circuit Court for Montgomery County. He raised several issues but focused principally on questions arising from the admission of the tape-recorded conversation: whether admission of the recording and testimony concerning it was error; whether, if error, the error was harmless under

the test enunciated in *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976); and whether, if Perry's complaint about the admission of that evidence is held to have been waived because of the lack of a timely objection, counsel's failure to make such an objection amounts to a Constitutionally ineffective assistance of counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The post-conviction court denied relief, and we granted Perry's application for leave to appeal. Although Perry presses several complaints in his petition, we need address only those relating to the 22–second tape recording.[1]

## BACKGROUND

### A. *The Trial*

The evidence that Perry murdered Mildred Horn, Trevor Horn, and Janice Saunders, though substantial and more than legally sufficient, was almost entirely circumstantial. We recited that evidence in some detail in the opinion disposing of Perry's direct appeal, and there is no need to recount it all here. As Perry had no apparent connection with the victims and as it seemed clear from the circumstances that robbery was not a motive for the break-in at Ms. Horn's home, a key

---

1. Our discussion of the admissibility of the tape recorded conversation assumes the continuing validity and the applicability of *Mustafa v. State*, 323 Md. 65, 591 A.2d 481 (1991). In that case, we held that the fruits of an intercepted wire communication were inadmissible in a Maryland court if the interception was in violation of the Maryland wiretap law, even though (1) the interception occurred in another jurisdiction, and (2) the interception was not unlawful in that jurisdiction. That ruling constituted a policy-oriented construction of the Maryland statute, carrying forth what we regarded to be the legislative intent. Although the General Assembly has met in eight annual sessions since the *Mustafa* opinion was filed, it has not seen fit to alter that ruling through an amendment to the statute. Judge Cathell urges that we overrule *Mustafa* for reasons that were considered by this court when that case was decided and that were articulated in Judge McAuliffe's dissent. In a brief footnote to its brief, the State has asked us to overrule *Mustafa* but has not sought to distinguish this case from it. As the Legislature has apparently acquiesced in our construction of the statute, we see no reason to disturb it now.

element of the State's case was tying Perry to Lawrence Horn, who *did* have a substantial motive to have Mildred and Trevor killed and also to have any witness to those murders killed. Horn lived in Los Angeles; Perry lived in Detroit; and Mildred and Trevor lived in Rockville.

The only direct testimonial evidence of contact between Horn and Perry came from Thomas Turner, a resident of Detroit, who was Horn's cousin and Perry's friend and who testified under a grant of immunity.[2] In the spring of 1992, Horn, while visiting Detroit, had complained to Turner of problems he was having regarding visitation with his children, and Turner (1) suggested that Perry might be able to help him, and (2) assisted Horn in contacting Perry. After the murders, Turner continued to act as an intermediary to facilitate communication between Horn and Perry. Apart from Turner's testimony and the tape recording at issue here, the State's evidence relating to contact between Horn and Perry was entirely circumstantial and consisted of telephone records documenting approximately 160 calls during 1992 and 1993(1) from public telephones in Detroit, located near Perry's home or in places Perry was known to visit, to Horn's home in Los Angeles, (2) from public telephones in Los Angeles to Perry's home in Detroit or to places in Detroit Perry was known to visit, (3) from public telephones in the Rockville area to Horn's home and from Los Angeles to hotels in Maryland at times when Perry was in Maryland, and (4) from public telephones in the Maryland–District of Columbia suburban area to Perry's home at times when Horn was in Maryland.

The State contended that these calls were, in fact, between Horn and Perry. Through evidence of the use of fictitious names, telephone cards in other person's names, and intermediaries, the State further attempted to show an elaborate scheme by Horn and Perry to camouflage the contact between them. All of the calls originated from pay phones; no evidence was uncovered of any calls between Horn's home and

---

2. Horn had grown up in Detroit and still had family there.

Perry's home. Similar camouflaging techniques were used to disguise the transfer of $6,000 from Horn to Perry, which presumably served as compensation for Perry's services. The money was transferred through Western Union in the name of a fictitious person in Los Angeles to Perry's girlfriend in Detroit.

On March 12, 1993—nine days after the murders—the Los Angeles police executed a search warrant at Horn's apartment. Montgomery County Detective Wittenberger, who accompanied the Los Angeles police, described the residence as a small one-bedroom apartment, with a living room, kitchen area, and bathroom. In the living room, the police found three computers, computer disks, hard drives, back-up drives, telephone and bank records, videotapes, 56 cassette tapes, 12 micro-cassette tapes, and a telephone answering machine. After listening to and examining this evidence, the police discovered, at the end of one of the micro-cassettes—Tape No. 5—a 22-second conversation between two men, whose voices were later identified as those of Horn and Perry. That conversation was copied to another cassette, and both tapes were eventually admitted into evidence against Perry. Tape No. 5 was admitted as State's Exhibit 342; the copy of the 22-second conversation taken from that tape was admitted as State's Exhibit 312. Those exhibits, and the testimony identifying the voices, are the subject of the dispute now before us.

A transcript of the conversation recorded on the tape was prepared by the State, but it was not admitted into evidence and is not in the trial record. Judge Pincus, the post-conviction hearing judge, listened to the tape and found the conversation to be as follows:

"Horn: Yeah.

Perry: Are you able to talk?

Horn: No.

Perry: OK. All right. So I mean, I'm sittin' there.

Horn: Can you uh ...

Perry: I could take a picture, I could take a picture of him. You know, right you know right ... there but I couldn't.

The noise, you understand what I'm saying? I wasn't able to do the others, didn't, I didn't want to go uh front wise . . ."

Although, at trial, Perry contended that the tape was unclear, he does not now contest Judge Pincus's finding of what it contains. Nor does the State.[3]

The tape recording was disclosed to defense counsel in discovery, and they recognized that it was an important and damaging piece of evidence, for either of two reasons. It was the only direct physical evidence of contact between Perry and Horn—it documented a conversation between the two. In pre-trial statements to the police, both men had denied ever speaking with the other. The State also had evidence, from the mass of telephone records, that a 22–second telephone call was made at 5:12 a.m. on March 3, 1993—very shortly after the murders were committed—from a pay phone at a Denny's restaurant in Gaithersburg, which is not far from Rockville, to Horn's home, and, although there was no clear evidence that Exhibits 312 and 342 captured that particular conversation, the State was likely to argue that they, in fact, did so. If the jury accepted that contention, it would have evidence not only of contact between the two men, but of contact that was contemporaneous with the murders and, depending on how the jury interpreted the conversation, could relate to the murders.

Immediately upon the entry of counsel's appearance on September 9, 1994—before the State disclosed the tape in discovery—Perry filed an omnibus motion to suppress evidence, including "[a]ll wire intercepts, eavesdropping, electronic surveillance and telecommunication records" on the ground that "[w]ire intercepts, eavesdropping, electronic surveillance and telecommunication records were obtained in violation of the Defendant's rights secured to Defendant by

---

**3.** It is fortunate that there is no disagreement about the contents of the conversation, as Exhibit 342 seems to have become misplaced. It clearly was before the post-conviction court, but it was not transmitted to us with the record and we have been unable to locate it in the circuit court.

the United States Constitution, the Maryland Constitution and federal and state substantive and procedural law." That motion remained pending when counsel learned of the tape in discovery. Notwithstanding their appreciation of the significance of the conversation on Tape No. 5, however, which they knew had been recorded by Horn, counsel did not mention that tape when arguing their motion to suppress and made no argument that the recording of the conversation by Horn constituted a violation of the Maryland Wiretapping and Electronic Surveillance law, Maryland Code, §§ 10–401 – 10–414 of the Courts and Judicial Proceedings Article (CJ). Though facially broad enough to include the recording by Horn, the motion to suppress, as argued, was limited to four other wiretaps made by the F.B.I. pursuant to orders entered by Federal courts in Los Angeles and Michigan. As so limited, the pre-trial motion was denied.

In his opening statement, the prosecutor informed the jury that it would hear a tape recording of Perry talking with Horn. The first evidentiary reference to the particular tape came during the testimony of Horn's daughter, Tiffany, on the fifth day of trial. Tiffany confirmed that Horn had an answering machine in his apartment, that there were cassettes that went with the machine, and that he taped calls. The prosecutor showed her Exhibit 312, which was marked for identification, and asked if she had listened to that tape prior to trial. She responded affirmatively and stated that, although she recognized one of the voices as that of her father, she could not identify the other voice. No objection was made with respect to that part of Tiffany's testimony. Neither Exhibit 312 nor Exhibit 342 were offered into evidence at that time.

Exhibits 312 and 342 came into evidence the next day during the testimony of Detective Wittenberger. The detective identified Exhibit 342 as one of the micro-cassettes seized pursuant to the search warrant and Exhibit 312 as containing a copy of the conversation recorded at the end of Exhibit 342. Perry objected on the grounds of materiality and relevance. He indicated, and the court acknowledged, that he had objected to those tapes earlier, although we are unable to locate any

reference to such an objection, but explained that his objection was based on the lack of testimony "as to the total qualities, the analysis of those items, as to their ability to portray accurately whatever may be recorded on them." In our earlier opinion, we treated that objection as being on the ground that "the quality of the sound reproduction was so poor that the tapes could not accurately present that which they purported to record." *Perry, supra,* 344 at 223, 686 A.2d at 283. The court overruled the objection without prejudice to Perry's renewing it if and when the State sought to play the tape for the jury.

That occurred on the tenth day of trial, during the testimony of Cynthia Turner, Thomas Turner's wife. When the prosecutor said that he intended to play Exhibit 312 and ask if Ms. Turner could recognize any of the voices, Perry renewed his objection on the grounds that (1) there had been no foundation laid as to the familiarity of the witness with any of the voices on the tape, and (2) the quality of the tape was such as to render any attempt to identify the voices unreliable. In support of the latter point, Perry noted that experts who had conducted a spectrographic analysis had been unable to make a voice identification. The court pointed out that the tapes were already in evidence, but it took a brief recess, listened to Exhibit 312 in chambers, and concluded that it was clear enough that someone familiar with the voices could possibly identify them. On that basis, the objection was overruled. The witness stated that she was familiar with Perry's voice. The tape was then played in court, following which Ms. Turner said that she recognized Perry's voice.

On the morning of the eleventh day of trial, counsel informed the court that, on his way home the previous evening, he realized for the first time—"the neurons connected"—that Exhibit 342 was made in violation of the Maryland wiretap law, and he renewed his objection to that exhibit and Exhibit 312 on that ground. He argued that the recording made by Horn constituted the interception of a wire communication, that it was without Perry's consent, and that, under Maryland law, with exceptions not relevant here, the interception of a

wire communication without the consent of all parties to the conversation is unlawful. He urged that CJ § 10–405 made any evidence derived from an unlawful interception inadmissible, whether or not the call originated in Maryland. Acknowledging that two witnesses had already identified the voices on the tape, counsel urged, at a minimum, that no further attempt be made to identify the voices. He indicated that, as alternative remedies, the jury be instructed to disregard the identifying testimony of Tiffany Horn and Cynthia Turner, that the court declare a mistrial, and, if the tapes had been presented to the grand jury, that the indictment be dismissed.

The State responded that, because Horn and Perry were co-conspirators, the wiretap law did not render the tape inadmissible—that even if Horn's act of recording the conversation was illegal, "Mr. Perry acting in concert with Mr. Horn is in essence a co-conspirator bound by his acts," and that it was not the legislative intent for the statute to cover that situation. The prosecutor asserted, without challenge, that the tape had not been played to the grand jury. The court deferred ruling on the motion until the conclusion of Thomas Turner's testimony, to give the State an additional opportunity to consider the matter. At that time, the court regarded the belated motion as presenting three issues: (1) whether the tape was admissible under the wiretap law; (2) who had the burden of establishing whether the taping was with mutual consent; and (3) whether the objection was waived. Ultimately, after listening to further argument, the court found that the objection was waived. The finding of waiver had a dual basis: counsel's failure to move to suppress the tape before trial, as required by Maryland Rule 4–252; and counsel's failure to object when the tape was offered into evidence the previous day. At no point in presenting and arguing his motion did Perry call the court's attention to CJ § 10–408(i), permitting a motion to suppress an unlawfully intercepted communication to be made during trial, and the court made no mention of that provision.

Following the court's ruling, the tape was played in court three more times. It was played first for Thomas Turner,

who identified the voices as being those of Horn and Perry. Detective Wittenberger was recalled, and he, too, confirmed that he had listened to the tape and identified the voices as those of Horn and Perry. During the State's closing argument, the tape was played twice. In his principal closing argument, the prosecutor indicated that he did not know when the conversation took place, other than that it occurred between the middle of 1992 and March 12, 1993, and he invited the jury to listen and determine for itself what the parties were saying. In his rebuttal argument, he asked the jury to consider whether the tape was of the conversation that occurred at 5:12 a.m. on March 3 and whether the noise referred to by Perry was the noise emanating from Trevor's breathing monitor. The tape was played again for the jury. The prosecutor stressed that Perry had told the F.B.I., upon his arrest, that he did not know Lawrence Horn and that Horn had denied ever speaking with Perry.

## B. *The Appeal*

On appeal, Perry pursued his claim that the tape was made in violation of the Maryland wiretap law and was inadmissible for that reason. He also took issue with the court's ruling that his objection had been waived. Although acknowledging that Maryland Rule 4–252 requires a motion raising the issue of an unlawful interception of a wire or oral communication to be made within five days after the interception is disclosed in discovery and that, ordinarily, the matter is waived if not so raised, Perry urged that the court retains discretion to consider a suppression motion at trial, and that a waiver under the rule is not absolute. In the plainly mistaken belief that the tapes had not yet been admitted into evidence when his wiretap objection was made, he also took exception to the court's finding of waiver based on his failure to object when the tape was played for Cynthia Turner and she identified his voice. He argued that the court could have ruled the tapes inadmissible, precluded further mention of them, and instructed the jury to disregard Cynthia Turner's testimony regarding

the voices on the tape.[4]   His point, as we perceived it, was that the trial court abused its discretion by failing to find good cause to excuse the waiver.   Alternatively, he contended that, if we were to determine that the objection was not properly preserved, we should find that trial counsel's performance was Constitutionally inadequate under *Strickland v. Washington, supra,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Perry never argued to us the effect of § 10–408(i).   As we indicated, "[b]efore this Court, as well as before the circuit court, the arguments for finding waiver, and for relieving from waiver, have revolved around Md. Rule 4–252(a)." *Perry v. State, supra,* 344 Md. at 228, 686 A.2d at 285.   With respect to that issue, we noted that, had a pre-trial motion to suppress the Horn tape been made, the State would have had 15 days to respond to it.   The State had no reason or occasion to focus on the complex factual and legal issues that might be generated by such a motion—issues that might require additional evidence.   Because, as to suppression issues, the parties are ordinarily bound by the record made at a suppression hearing, we concluded that, in the interest of fairness, "the parties should be given substantially the same opportunity to develop a factual record, and legal arguments based thereon, in presenting and responding to Perry's belated suppression motion that they would have enjoyed in presenting and responding to a pretrial suppression motion." *Id.* at 226, 686 A.2d at 285. For that reason, we held that the trial court did not abuse its discretion in refusing to interrupt the trial to conduct a belated suppression hearing for which neither party had an adequate opportunity to prepare.   For like reasons, we reject-

---

4.   In his brief, Perry asserted that "[his] objection to State's Exhibit 312 and any evidence derived therefrom was brought up while it was still within the power of the court to correct the error.   The exhibit itself had not yet been entered into evidence, although it had been played for the jury during the testimony of Cynthia Turner."   That last statement is not correct.   As we have indicated above, and as we stated in our earlier opinion, 344 Md. at 223, 686 A.2d at 283, the tapes were admitted into evidence during the testimony of Detective Wittenberger on September 20, 1995.   The wiretap objection was not made until September 29, 1995.

ed Perry's invitation to decide his claim of ineffective assistance of counsel in the direct appeal. The net result of those conclusions was our holding that Perry's claim that State's Exhibit 312 (and State's Exhibit 342) were improperly admitted was "not before us on direct appeal," but that our ruling and our affirmance of the judgment of conviction was "without prejudice to Perry's raising on post conviction review his contention that Exhibit[s] 312 [and 342] should have been excluded under the Maryland wiretap statute." *Id.* at 228, 686 A.2d at 285.

Although Perry never noted the existence, and therefore never argued the effect, of § 10–408(i), we pointed out that, under that statute, a motion to suppress a communication intercepted in violation of the wiretap law "may be made before *or during* the trial." *Id.* at 229, 686 A.2d at 286 (emphasis added). We concluded that "[i]t was unnecessary for Perry to have referred the trial court specifically to CJ § 10–408(i) in order to preserve his argument that the trial court should have considered his mid-trial motion to suppress." *Id.* We assumed, *arguendo,* that § 10–408(i) conferred a procedural right to seek suppression during the trial, but, for the reasons already noted in our discussion of Rule 4–252, we were unable to determine from the existing record whether a hearing on a mid-trial motion "would have resulted in the suppression" of Exhibits 312 and 342. *Id.* Accordingly, we decided that we would not address the effect of § 10–408(i) in the direct appeal but made clear that that ruling "likewise, is without prejudice to Perry's relying on CJ § 10–408(i) in a post conviction proceeding." *Id.* With the caveats noted, and finding no other reversible error, we affirmed the judgments.

## C. *The Post–Conviction Case*

In the post-conviction case, Perry presented his complaint about the admission of Exhibits 312 and 342 in two contexts—as trial error and as an example of the ineffective assistance of counsel. His trial error allegation dealt both with the admissibility of the tapes and the trial court's ruling that his objection to those tapes was waived. The alternative allegation was

that trial counsel was ineffective in failing (1) to file a pre-trial suppression motion,[5] and (2) to object to Exhibit 312 (and presumably Exhibit 342 and the testimony relating to those exhibits as well) in a timely manner.

The court dealt with most of the issues as presented by Perry in his petition although, as we shall explain, it treated the waiver issue narrowly, focusing only on whether the trial court abused its discretion in declining to entertain the mid-trial motion and concluding that that issue had been raised and finally litigated in Perry's direct appeal. The court noted that it had nonetheless held a suppression hearing to determine the admissibility of the exhibits and, reserving momentarily on the substantive issue, rejected Perry's contention that, if the exhibits were inadmissible, the court must apply the *Dorsey v. State* harmless error standard. That standard, it held, was inappropriate in a post-conviction proceeding. Rather, the court said that it had held a suppression hearing "to determine whether an error was committed by trial counsel sufficient to support a claim of ineffective assistance of counsel under the guidelines of *Strickland* and *Oken [v. State,* 343 Md. 256, 681 A.2d 30, *cert. denied,* 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997)]." The court thus treated the merits of Perry's claim regarding the admission of the two exhibits solely in the context of his assertion that counsel was ineffective in failing to file a pre-trial suppression motion and to make a timely objection at trial.

On that issue, the court made three basic findings. First, relying principally on *United States v. Underhill,* 813 F.2d 105

---

5. As we indicated, counsel *did* file a pre-trial motion to suppress intercepted communications—a motion that, in our view, sufficed to raise the admissibility of State's Exhibits 312 and 342. The relevant omission was in narrowing the argument on the motion to the government wiretaps and not pursuing the objection to the tape made by Horn. Both counsel and the post-conviction court nonetheless continually refer to the alleged deficiency as a failure to file a pre-trial suppression motion. Rather than correct that assertion each time we cite it, we shall treat the allegation as one of failing to pursue the suppression of the exhibits and testimony relating to them.

(6th Cir.1987),[6] it concluded that Perry and Horn were co-conspirators and that, "as a member of the conspiracy with Horn, Perry is bound by the acts of his co-conspirator and may be held to have waived his right of privacy in communications made in furtherance of the purposes of the conspiracy." The "general purpose and legislative intent" of the Maryland wiretap law, it said, "would be violated if Perry were able to suppress the tapes." Second, the court found by implication from the fact that "[t]he relationship between Lawrence Horn and James Perry was covered in layers of secrecy and deception," that the recording was made inadvertently and therefore not willfully.[7] It concluded, from the "extraordinary lengths" they went to hide their relationship, that "[t]o suggest that Horn would 'willfully' record a conversation between himself and Perry defies logical explanation." Thus, it found, for that reason as well, that the wiretap law "would not apply." Upon those findings, the court denied the motion to suppress, determining that "Exhibit 312, even if objected to in a timely fashion, would have been admissible during the trial in this case."

The court then turned, alternatively, to whether, if it had found Exhibit 312 to be inadmissible, trial counsel's failure to object timely to its admission could be regarded as unreasonable. Though acknowledging that counsel's failure to file a timely suppression motion was not due to strategic considerations but rather to their unawareness of the possible application of the Maryland wiretap law, the court nonetheless declined to determine whether that failure constituted deficient

---

**6.** *Cert. denied sub nom. Rayburn v. United States,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376, *sub nom. Tata v. United States,* 483 U.S. 1022, 107 S.Ct. 3268, 97 L.Ed.2d 766, *sub nom. Osborne v. United States,* 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 98, and *sub nom. Person v. United States,* 484 U.S. 821, 108 S.Ct. 81, 98 L.Ed.2d 43 (1987).

**7.** There are two acceptable spellings of the word—"willful" and "wilful"—although, according to WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (2d ed.1983), the former is the preferred spelling. The statute uses the one-l version, and when quoting the statute, we shall as well. In text, however, we shall use the preferred "willful."

performance, for it concluded that, even if it were, the error was not so serious as to deprive Perry of a fair trial. In that regard, the court declared that the evidence presented by the State at trial was "overwhelming," and that, even without Exhibit 312, Perry would have been convicted. From the content of the recorded message and from the fact that the tape did not appear to record the entire conversation, the court doubted that the exhibit captured the 22–second conversation that occurred on the morning of the murders. The fact that the conversation recorded on the tape lasted 22 seconds was, in the court's view, merely coincidental. The significance of the exhibit was limited, therefore, to simply proving that Horn and Perry were in contact with each other by telephone. There was "an abundance of other evidence" to that effect, however, much of which the court recounted. Its ultimate conclusion was that "even if the 22–second tape had been suppressed, there is not a reasonable probability or a substantial possibility, that the verdict would have been different."

## THE ISSUES

Regrettably, the issues articulated by Perry are, to some extent, based on incorrect assumptions or are incomplete and, to that extent, cannot be fairly resolved precisely as presented. We have noted, for example, the assumption by all parties and the post-conviction court that no pre-trial motion to suppress the Horn tape was made and the articulation of the issues on that premise. Throughout, the issue of the 22–second tape has often been framed with reference only to State's Exhibit 312, when it necessarily involves as well Exhibit 342 and the testimony of four witnesses who identified the voices on that tape. Perry has assumed in this appeal that the post-conviction court held that the issue of admissibility of the tape had been finally litigated, which is not the case. The real complaints made by Perry are, however, evident. The issues presented by those complaints, as we see them, are as follows:

(1) Did the post-conviction court err in concluding that the issue of whether the trial court abused its discretion in

failing to entertain the mid-trial motion to suppress Exhibits 312 and 342 had been finally litigated;

(2) Were Exhibits 312 and 342 and the testimony relating to them admissible:

(a) Did the post-conviction court err in holding that, as a co-conspirator, Perry waived his right to privacy and, for that reason, could not avail himself of the exclusionary rule embodied in the wiretap law;

(b) Did the court err in holding that willfulness on the part of Horn was required in order for the intercepted communication to be suppressible;

(c) Did Perry consent to having the conversation recorded;

(3) If Exhibits 312 and 342 and the testimony relating to them were inadmissible under the wiretap law, what test of harmlessness or prejudice should be applied and was that test satisfied;

(4) If the exhibits and testimony were inadmissible and not harmless, did Perry nonetheless waive his objection to them by failing to make it timely; and

(5) If the answer to Question (4) is "yes," was the assistance of counsel Constitutionally ineffective, for purposes of Article 21 of the Maryland Declaration of Rights and the Sixth Amendment to the United States Constitution, under the standards enunciated in *Strickland v. Washington* and *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)?

## DISCUSSION

### A. *What Was Finally Litigated?*

Perry contends in his brief that the post-conviction court erred "in concluding that the issue of the 22–second tape had been finally litigated." In support of that proposition, he calls attention to the statements in our earlier opinion that "Perry's contention that Exhibit 312 was improperly admitted and should have been suppressed is not before us on direct appeal"

and that our affirmance of the judgments of conviction was without prejudice to Perry's raising that issue in a post-conviction proceeding. *Perry, supra,* 344 Md. at 228, 686 A.2d at 285.

If, indeed, the post-conviction court had held that the issue of admissibility of the exhibits and testimony had been finally litigated, Perry would be correct in his assessment of that ruling, but that is *not* what the post-conviction court held. Unfortunately, the post-conviction court looked at the complaint made by Perry in too narrow a fashion. In his petition for post-conviction relief, Perry noted the mid-trial motion to suppress and its denial by the court and complained that "[t]he trial judge incorrectly ruled that because the tape had not been the subject of a pretrial suppression motion, that all rights to suppress it were waived by the Petitioner. That ruling was incorrect and highly prejudicial to the Petitioner."

Although that assertion embraced the whole issue of waiver, the post-conviction court seemed to interpret it as merely an attack on whether the trial court abused its discretion in failing to interrupt the trial to entertain the belated motion to suppress. The relevant statement, appearing on page 15 of the post-conviction court's Statement of Reasons was:

"Petitioner argues that the trial judge's *refusal to entertain the suppression of the tape* was highly prejudicial to the Petitioner and an abuse of discretion by the court. The issue was raised in the direct appeal and was decided against petitioner's position."

(Emphasis added).

In the direct appeal, we noted the practical problems that would have been encountered had the trial court suspended the trial to hold a suppression hearing, and we held, unequivocally, that "[f]or this reason, the trial court acted well within its discretion in refusing to interrupt the trial in order to conduct a belated suppression hearing for which neither party had the opportunity adequately to prepare." *Perry, supra,* 344 Md. at 226, 686 A.2d at 285. The precise ruling by the post-conviction court as to what was finally litigated, though

not fully responsive to Perry's claim, was correct. More important, because that court did what we directed it to do—hold a suppression hearing itself and rule on admissibility—the fact that the ruling relating to the trial court's action did not fully address Perry's complaint was of no prejudice to him. By holding that suppression hearing and ruling on the merits of Perry's claim that the evidence should have been suppressed, the post-conviction court clearly did not treat the suppression issue as having been finally litigated.

### B. *Admissibility*

#### (1) *Co–Conspiracy Defense*

At the post-conviction hearing, the State argued, according to the court, "that the recording is admissible under Maryland law because Horn and Perry were co-conspirators"—that "the recording would be admissible against Horn because he made it" and would likewise "be admissible against Perry because Perry was his co-conspirator and the recording was an act done in furtherance of the conspiracy." The court announced that it "agrees with this argument." Citing *United States v. Underhill, supra,* 813 F.2d 105, the court concluded that "as a member of the conspiracy with Horn, Perry is bound by the acts of his co-conspirator and may be held to have waived his right of privacy in communications made in furtherance of the purposes of the conspiracy."

Apparently treating this as an application of the co-conspirator exception to the hearsay rule (*see* Md. Rule 5–803(a)(1)), Perry responds that the co-conspirator exception applies only to communications "in furtherance of the conspiracy" and asserts that the conversation captured on the tape does not fall into that category. He urges (1) that if the message recorded on the tape is *not* the conversation that occurred at 5:12 on the morning the murders was committed, it establishes no more than that the parties had contact and is therefore not a communication in furtherance of the conspiracy, and (2) that if the recording *was* of the conversation that morning, it occurred after the murders had been committed, by which

time the objective of the conspiracy had been accomplished and the conspiracy had ended. The State takes issue with both assertions but contends that the court was not applying the hearsay exception in any event. Rather, it treats the court's ruling as one of statutory construction—that because Perry waived or relinquished his expectation of privacy, the exclusionary rule of the statute does not apply.

We agree that the issue is one of statutory construction and does not involve the hearsay exception articulated in Md. Rule 5–803(a)(1). We disagree, however, that there is any co-conspirator exception embodied or implicit in the Maryland wiretap law.

*Underhill* arose out of an illegal gambling operation conducted in Tennessee. Two members of the operation, Rokitka and Underhill, routinely taped telephone conversations with other members who were calling in bets, for the purpose of making a record in the event that any dispute later arose about the terms of the betting transaction. The F.B.I. seized the tapes during a search of Rokitka's apartment, and the issue arose of whether those tapes were admissible at the trial of the conspirators. The question hinged on the scope and application of the Federal wiretap law, 18 U.S.C. § 2510, *et seq.* Section 2515 provided that no part of the contents of a wire or oral communication that has been intercepted may be received in evidence if the disclosure of that information would be in violation of the Act. That section, the court said, was not self-executing, but depended on § 2518(10)(a)(i), which permitted an "aggrieved person," defined as a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed, to move to suppress the contents of an intercepted communication on the ground that the interception was unlawful. The issues were (1) whether the interceptions were unlawful, and (2) if so, whether the defendants were aggrieved persons entitled to suppression.

There were two classes of defendants—Underhill and Rokitka, who had made the recordings, and Person, a caller whose

conversations were taped without his consent. Because the recordings were made by private individuals not acting under color of law, the lawfulness issue was governed by § 2511(2)(d). That section stated that it was not unlawful for such a person to intercept a wire or oral communication when that person is a party to the communication or when *one* of the parties to the communication had given prior consent to the interception, *unless* the communication was intercepted for the purpose of committing a criminal, tortious, or other injurious act. Because the making of a gambling record violated a Tennessee statute, the taping of the conversations for the purpose of making such records was, itself, unlawful. The question, then, was whether the defendants had a basis for relief.

Underhill and Rokitka, as noted, had made the recordings, and the court did not believe that it was the intent of Congress "to shield the very people who committed the unlawful interceptions from the consequences of their wrongdoing," *Underhill*, 813 F.2d at 112. The purpose of the law, the court declared, was to provide "protection to the victims of unlawful interceptions, not to the perpetrators." *Id.* On that premise, the court held that Underhill and Rokitka had "waived their right of privacy in these communications by their deliberate act of causing them to be recorded." *Id.* To construe the law otherwise would produce an absurd result that could not have been intended by Congress.

Person, however, argued that he neither made nor consented to the interception and that he was entitled to suppression of the tapes. Citing *Pinkerton v. United States*, 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946) and *United States v. Bowers*, 739 F.2d 1050, 1052 (6th Cir.1984), *cert. denied sub nom. Oakes v. United States*, 469 U.S. 861, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984), the court extended the basis it had used for denying relief to Underhill and Rokitka to Person as well and held that "[a]s a member of the conspiracy Person was bound by the acts of his co-conspirators and may be held to have waived his right of privacy in

communications made in furtherance of the purposes of the conspiracy." *Underhill,* 813 F.2d at 112. It stated:

> "Each party to a conversation takes the risk that the other party will record and divulge the contents of that conversation. *Smith v. Cincinnati Post & Times Star[Times-Star],* 475 F.2d 740 (6th Cir.1973); *United States v. Felton,* 753 F.2d 256, 259 (3rd Cir.1985). In enacting § 2511(2)(d), Congress sought to protect parties from this risk by making otherwise legal interceptions unlawful if the purpose of the interception was an act enumerated in the statute. In doing so, it did not intend to deprive prosecutors of the most cogent evidence of wrongdoing because the defendants record evidence of their crimes by intercepting communications with their confederates."

*Id.*

The rationale applied in *Underhill* was confirmed by the Sixth Circuit Court of Appeals in *Traficant v. C.I.R.,* 884 F.2d 258 (6th Cir.1989). *See also United States v. Bragan,* 499 F.2d 1376 (4th Cir.1974); *United States v. Murdock,* 63 F.3d 1391 (6th Cir.1995) and *United States v. Nietupski,* 731 F.Supp. 881 (C.D.Ill.1990). *Compare,* however, *In Re Grand Jury,* 111 F.3d 1066 (3d Cir.1997).

■ The State's and the post-conviction court's reliance on *Underhill* is misplaced, not because we necessarily disagree with the Sixth Circuit court's interpretation of the Federal wiretap law, although the consistency of that interpretation with some of the pronouncements in *Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), appears to be a bit strained, but because, at least with respect to its holding concerning the defendant Person, it has no application to, and indeed is incompatible with, the Maryland wiretap law. The critical distinction is highlighted by the *Underhill* court's statement that "[e]ach party to a conversation takes the risk that the other party will record and divulge the contents of that conversation." As the cases cited in *Underhill* illustrate, that statement emanates from the fact that, under § 2511(2)(d) of the Federal wiretap law, it is not unlawful for one party to a telephone conversation to tape and divulge the

contents of the conversation, even without the knowledge or consent of the other party to the conversation, unless the taping is for an unlawful purpose. The thrust of the Federal Act is that *any* conversation may be recorded by a private individual unless the recording is for an unlawful purpose, and under that scheme, parties to telephone conversations really have no assurance that the conversation will not be taped and must assume the risk that it might be recorded.

That is much less the case under the Maryland law. Section 10–402(a) states expressly that, "except as otherwise *specifically* provided in this subtitle," it is unlawful for "any person" willfully to intercept any wire communication.[8] (Emphasis added). The requirement of a specific exception, which also appears in the Federal Act, assumes a greater significance because of the State-law requirement of all-party consent. The thrust of the State law is that *no* conversation may be willfully taped unless specifically allowed, and the only provision that would allow a private person, not acting as a government agent, in conformance with a court order, or as an employee of a communication company, to intercept a wire communication is § 10–402(c)(3), which states:

> "It is lawful under this subtitle for a person to intercept a wire, oral, or electronic communication where the person is a party to the communication *and where all of the parties to the communication* have given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of this State."

(Emphasis added).

As we pointed out in *Mustafa v. State, supra,* 323 Md. at 74, 591 A.2d at 485, "[t]he two-party consent provision of the

---

**8.** Both the State and Federal wiretap laws deal with wire, oral, and electronic communications. The communication at issue here was a wire communication, and, to avoid unnecessary repetitions, we shall speak of the statutes in that regard. We do not mean to suggest that, by limiting our discussion to wire communications, oral and electronic communications would be treated differently.

Maryland Act is aimed at providing greater protection for the privacy interest in communications than the federal law." The requirement of consent by *all* parties for the recording of a telephone conversation by a private individual has been a fundamental part of Maryland law since at least 1956, and the one attempt by the Legislature, in 1973, to modify that provision met with a veto in which the Governor expressed his deep concern that the "opportunity for unwarranted spying and intrusions on people's privacy authorized by this bill is frightening." *See* 1973 Md. Laws, Vol. II, at 1925.[9] Under long-standing Maryland law, therefore, a party to a telephone conversation does *not* take the risk that another party, not acting as, or under the direction of, a government agent, will record and divulge the contents of the conversation, for, absent the prior consent of the party, such recording and divulging is clearly prohibited and, indeed, if done willfully, constitutes a criminal offense. Given that prohibition, participants in a telephone conversation may ordinarily rely on the fact that their conversation will *not* be surreptitiously recorded or, at the very least, that, unless done in strict conformance with the State law, a recording of their conversation will not be admitted into evidence in any Maryland court.

Without commenting on whether one who unlawfully tapes a conversation can seek the protection of the exclusionary rule embodied in the Maryland statute—an issue that is not before us in this case—we find nothing in the Maryland wiretap law, either in its wording or in its legislative history, suggesting an intent by the Legislature to preclude any other party to an

---

**9.** The Governor noted in his veto message that the provision he found offensive was taken from § 2511(2) of the Federal Act, that it would allow "the police, and anyone else, to intercept, listen in, and record the private conversations of people where only one party to the conversation has given consent to such activity," and that the other party to the conversation "is thus subject to having his conversation intercepted without his knowledge, without prior court approval, and without any need to show probable cause to believe that criminal activity of any kind may be afoot." *Id.* at 1924–25. That is what the Governor (and ultimately the General Assembly, as evidenced by its later decision to continue the requirement that *all* parties consent) found "frightening."

intercepted conversation from invoking the exclusionary rule on the ground that he/she is a co-conspirator with the person who unlawfully recorded the conversation. Any exception that would make an interception lawful or that would preclude an aggrieved person from moving to suppress an unlawful interception must be "specifically" provided for in the Act, and we find no specific exception for co-conspirators. Thus, although conspirators are generally bound by the acts and statements of their co-conspirators, done or made in furtherance of the conspiracy, there is no basis for concluding that an otherwise aggrieved person—in this instance one whose conversation is taped without his consent—loses his right to suppress the tape merely because the taping is done by a co-conspirator. *See State v. Maddox,* 69 Md.App. 296, 300–01, 517 A.2d 370, 372 (1986).

It is interesting to note that, 40 years ago, we declined to follow a Supreme Court decision, *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), that allowed the admission of unconsented-to eavesdrop evidence under the more liberal Federal wiretap law then in existence. *See Robert v. State,* 220 Md. 159, 151 A.2d 737 (1958) (holding inadmissible under Maryland law the testimony of police officers who listened on an extension telephone to a conversation between the defendant and his daughter without the defendant's knowledge or consent). We declared in that case that "[t]he terms of our statute as to obtaining the contents of a telephonic communication and as to the consent of all participants are so different from the language of the Federal Act that we think that the Rathbun case is inapplicable." *Id.* at 171, 151 A.2d at 743. That remains the case today. We therefore hold that the post-conviction court erred in finding the exhibits and testimony admissible under some implied co-conspirator exception.

### (2) *Willfulness*

CJ § 10–405 provides that, whenever a wire communication has been intercepted, no part of the contents of the communication and no evidence derived therefrom may be received in

evidence "if the disclosure of that information would be in violation of this subtitle." To determine whether the disclosure of an intercepted communication is in violation of the subtitle, it is necessary to look at § 10–402(a)(2) and § 10–407. The former makes it unlawful for any person to "wilfully disclose" to any other person the contents of a wire communication "knowing or having reason to know that the information was obtained through the interception of a wire . . . communication in violation of this subtitle." Section 10–407(c), however, provides, in relevant part, that any person who has received, "by any means authorized by this subtitle," any information concerning a wire communication "intercepted in accordance with the provisions of this subtitle," may disclose the contents of that communication, or the derivative evidence, while giving testimony in court under oath or affirmation.

Under § 10–407(c), Detective Wittenberger was entitled to disclose the tape—to produce, identify, and testify about it—only if he had received the tape by a "means authorized by this subtitle" *and* the interception was "in accordance with the provisions of this subtitle." There is no doubt that Wittenberger received the tape by an authorized means; he acquired it through execution of a search warrant, the validity of which is not in dispute. The question, then, is whether the interception by Horn was "in accordance with the provisions of the subtitle."

In this regard, the State looks to § 10–402(a), which makes it unlawful for a person to "wilfully" intercept a wire communication. It maintains, and persuaded the post-conviction court to accept, that a communication that was not intercepted "wilfully" was not intercepted unlawfully, and thus in violation of the subtitle. It urges that unless Horn taped the conversation "wilfully," there was no impediment to the disclosure of the tape or to the admission of evidence regarding it. As the court found, as a fact, that Horn made the tape "inadvertently," and therefore not "wilfully," the State maintains that there was no error in the admission of the challenged evidence.

Perry has a different view. He contends that the require-
ment of willfulness pertains only to civil or criminal actions
filed against the interceptor of the communication (or one who
uses or discloses the contents of the communication knowing
that it was unlawfully intercepted). Willfulness, he urges, is
not required for purposes of the exclusionary rule. He cites
no authority for that proposition, and we can find no cases
either supporting or negating it, but a fair reading of the
statute convinces us that Perry's interpretation is correct.

The statute, unfortunately, is a bit convoluted, requiring
consideration of the interplay between several different sec-
tions. The confusion that generates the issue results from
some sections using the term "lawful" or "unlawful," while
others speak of whether the interception was "in accordance
with" the subtitle.

The requirement of willfulness appears only in § 10–402(a),
which makes it unlawful for a person to: (1) willfully intercept,
endeavor to intercept, or procure another to intercept or
endeavor to intercept a wire communication; (2) willfully
disclose or endeavor to disclose the contents of a wire commu-
nication, knowing or having reason to know that the informa-
tion was obtained through the interception of a wire communi-
cation in violation of the subtitle; or (3) willfully use or
endeavor to use the contents of a wire communication knowing
or having reason to know that the information was obtained
through the interception of a wire communication in violation
of the subtitle. Section 10–402(b) makes it a felony to violate
subsection (a). Unquestionably, to obtain a conviction for the
violation of § 10–402(a), the State would have to prove that
the defendant acted willfully.

Section 10–410(a) creates for the benefit of any person
whose wire communication was intercepted, disclosed, or used
in violation of the subtitle a civil cause of action against the
person who intercepted, disclosed, or used the communication.
Although § 10–410(a) does not refer directly to § 10–402(a), as
does § 10–402(b), the reference is implicit from the fact that
liability rests solely on the interception, disclosure, or use of

an intercepted communication—the three acts specified as unlawful in § 10–402(a). The prevailing view, in the Federal courts and in the Court of Special Appeals, is that the same mental state required for a criminal conviction under § 10–402 is also required as a condition to civil liability under § 10–410. *See Citron v. Citron,* 722 F.2d 14 (2d Cir.1983), *cert. denied,* 466 U.S. 973, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984); *Malouche v. JH Management Co.,* 839 F.2d 1024 (4th Cir.1988); *Hawes v. Carberry,* 103 Md.App. 214, 653 A.2d 479 (1995); *Fearnow v. Chesapeake Telephone,* 104 Md.App. 1, 655 A.2d 1 (1995). The apparent basis for that approach is that the civil liability under § 10–410 and its Federal counterpart, § 2520, attaches only to violations of § 10–402(a), or its Federal counterpart, § 2511.

Unlike §§ 10–402(b) and 10–410(a), which, directly or by clear inference, tie criminality and civil liability to a violation of § 10–402(a), § 10–407(c) permits testimonial disclosure only if the communication was intercepted "in accordance with the provisions of this subtitle." The interception by Horn, clearly, would *not* have been in accordance with the provisions of the subtitle if it was done without Perry's consent.

This construction of §§ 10–405 and 10–407 raises the prospect of a non-willful interception, without the consent of all parties, being neither lawful under § 10–402(c) nor unlawful under § 10–402(a), which would appear to be an anomaly. When analyzed from the point of view of public policy, however, it is not an anomaly. The Legislature has made unmistakably clear that, except as otherwise specifically provided in the subtitle, wire communications are not to be intercepted without the consent of all parties. As noted, that has been part of our law for more than 40 years and represents a fundamental substantive statement of public policy.

The exclusionary provision in § 10–405 and the criminal and civil liability provided for in §§ 10–402(b) and 10–410(a) are alternative sanctions designed to protect and enforce the substantive provision. Except for those relatively few and ordinarily minor offenses that are regarded as *malum prohi-*

*bitum,* some form of *mens rea* is almost always required for criminal and civil liability, even if, for civil liability, the degree of required *mens rea* may be only simple negligence; conditioning such liability on a finding of willfulness is therefore entirely consistent with our general jurisprudential construct. That is much less the case with respect to an exclusionary rule remedy, however. The exclusionary provision operates only upon the communication itself, depriving it of evidentiary value, rather than against the person or property of the interceptor.

It would not be at all unreasonable for the Legislature to have desired to give that remedy the broader sweep—to make a communication intercepted without consent and not otherwise authorized inadmissible in evidence, without regard to the mental state of the person who made the interception, even if, for purposes of establishing civil or criminal liability, it required willfulness on the part of the interceptor. For one thing, there may be circumstances under which the person who unlawfully intercepted the communication is not subject to criminal or civil prosecution in Maryland, and the only issue is whether a Maryland court should, in effect, bless the unlawful conduct by permitting the communication to be admitted into evidence. From the point of view of the person whose conversation was intercepted without his or her consent and is later sought to be used in evidence, the interceptor's mental state at the time of the interception is of marginal relevance. Whether the interception was done willfully or non-willfully, the violation of the person's right to privacy was the same.

Accordingly, subject to the caveat noted above—our decision not to address in this case whether the exclusionary rule would apply when the communication is offered against the interceptor himself/herself—we hold that a communication intercepted without the consent of all parties to the conversation, unless the interception was otherwise specifically authorized under the subtitle, is inadmissible in evidence.

Judge Rodowsky disagrees with our construction of § 10–405 and would hold that (1) willfulness *is* required as a condition of exclusion, and (2) in this case, the interception was not willful.

■ The post-conviction court concluded, from the elaborate attempt by Horn and Perry to conceal their connection and from the fact that, of all of the recordings discovered in Horn's apartment, only this 22–second snippet existed, that Horn's recording of this one conversation must have been inadvertent. If that is so, the recording would not have been "willful," however that term may reasonably be defined. Because of our conclusion that willfulness is not required as a condition of exclusion, it is unnecessary for us to consider whether the recording by Horn was willful or inadvertent. Were we called upon to review the lower court's finding, however, we would hold that, on the record in this case, it was clearly erroneous.

The finding of inadvertence is a finding of fact, which, if before us, we would review under the clearly erroneous standard. Maryland Rule 8–131(c) makes clear that an appellate court will not set aside a trial court judgment on the evidence unless clearly erroneous, and due regard will be given to the opportunity of the trial court to judge the credibility of the witnesses. In this instance, there appear to have been no credibility determinations, as such. The court's finding of inadvertence rested solely on the inference it drew from the two circumstances noted, about which there was no substantial dispute.

In the absence of any other evidence bearing on the issue, that inference would be a permissible, though certainly not a necessary or compellable, one. The fact that Horn and Perry went to great lengths to preclude anyone else from discovering their relationship does not necessarily mean that Horn would not intentionally create some evidence of the relationship for his own purposes. In retrospect, it may have been a foolish thing to do, as in retrospect the taping of conversations in the Oval Office of the White House may have been a foolish

thing to do, but that does not preclude a finding that the taping was nonetheless deliberate and intentional, in the belief that the tapes would never fall into hostile hands. *Underhill,* relied upon by the post-conviction court, is a clear example of co-conspirators intentionally taping incriminating conversations. There would be no need for us to speculate here as to *why* Horn might have intentionally recorded the conversation with Perry; the point is only that the camouflaging of their relationship does not lead inexorably, as the court supposed, to a conclusion that the tape in question was made inadvertently.

More important, in drawing the inference of inadvertence, the court appears to have overlooked entirely several other significant items of evidence directly bearing on the issue. Tiffany Horn, who lived with her father for about three months while she was in California from the autumn of 1989 until the end of the summer of 1991, and who visited with him periodically in 1992, confirmed that her father had an answering machine, that there were cassette tapes that went with the machine, and that he taped calls. Consonant with that testimony was the testimony of Detective Wittenberger and the physical evidence of the various cassette and micro-cassette tapes found in Horn's apartment. As noted, there were 12 micro-cassette tapes and 56 regular cassette tapes. The police listened to those tapes, and Detective Wittenberger testified that they recorded conversations Horn had with various people—with Mrs. Horn and other family members, friends, and attorneys—emanating both from calls made *to* Horn's home and calls that he placed. The tapes also recorded messages left on Horn's answering machine.

Wittenberger described the answering machine itself, which the police still had in their possession but which was never offered into evidence. He said that the machine had two "set-ups." It could be on a "no ring delay," which meant that "the tape was immediately activated when the phone call came in," or on a "ring delay," which meant that, "after four rings, the answering machine would pick up." At that point, "the tape would activate itself and start recording." Once the machine activated, it would start to record automatically, even if Horn

picked up the phone. The micro-cassettes, Wittenberger said, each captured between 30 and 60 minutes of conversation. Some of them had conversations recorded over other conversations, indicating that the tape had been rewound and new conversations recorded.

This evidence establishes, beyond doubt, that Horn did not use his answering machine simply to record messages when he was not available to take the call, which is the normal function of such devices. It indicates, rather, that (1) he routinely taped all or most of the conversations he had, including calls that he placed, and (2) he retained those taped conversations. There is a fair inference that conversations initially recorded on the micro-cassette tapes were re-recorded on the larger cassette tapes, as there is no evidence that the answering machine would accommodate both size of tapes. The fact that he had retained between six and twelve hours of conversation on the micro-cassette tapes and perhaps 100 hours or more on the larger cassettes is telling evidence that the conversations recorded on those tapes were not recorded inadvertently. The fact that the 22–second conversation with Perry was at the end of a tape and that that tape, too, was retained indicates that he recorded the conversation intentionally. Given the weakness of the inference drawn by the post-conviction court solely from the efforts by Horn and Perry to hinder any public awareness of their contacts, this evidence, never mentioned, and therefore probably not considered, by the court would convince us that the factual conclusion drawn from that inference was clearly erroneous. The whole of this record shows quite clearly that Horn's interception of the conversation with Perry was deliberate, purposeful, and intentional, and therefore willful. Unless consented to by Perry, the interception would therefore have been unlawful, even under Judge Rodowsky's view of § 10–405.

### (3) *Consent*

Because it found that Perry, as a co-conspirator, could not invoke the protection of the wiretap law and because it found, alternatively, that willfulness was required on Horn's part as a

condition to suppression and that the conversation was not recorded willfully, the post-conviction court never addressed the question of whether Perry had consented to having the conversation recorded. As we have rejected those findings, it becomes critical to deal with the issue of consent.

Perry averred (belatedly) at trial, and maintained throughout the post-conviction proceeding, that he never consented to the recording of his conversation. He placed into evidence at the post-conviction hearing an affidavit to that effect, although we have been unable to locate that affidavit in his record extract. The State never contested Perry's averment of nonconsent. It made no argument to us, either in its answer to the Application for Leave to Appeal or in its brief, that Perry did, in fact, consent to having the conversation recorded. Nor does it appear that the State ever contested Perry's statement at the post-conviction hearing. Thus, there is no issue in this case that Perry did not consent to having his conversation recorded by Horn.

### (4) *Conclusion*

As we have concluded that Horn unlawfully intercepted the 22–second conversation with Perry, without Perry's consent, it follows that the tapes made of that conversation (Exhibits 312 and 342) and the testimony identifying the voices on the tapes were inadmissible under § 10–405.

### C. *Harmlessness*

There is a dispute between the parties over what standard of harmlessness, or prejudice, should be applied if, as we have done, we were to conclude that admission of the challenged evidence was in error. The post-conviction court accepted the State's argument that, because the issue was being addressed in a post-conviction proceeding, the two-prong test of *Strickland v. Washington, supra*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 is applicable. Perry maintains that, because we directed the post-conviction court to hold the equivalent of a pre-trial suppression hearing and the issue was admissibility *vel non*, the harmless error standard of *Dorsey v. State*,

*supra,* 276 Md. 638, 350 A.2d 665 applies and that the judgment must be set aside unless we are convinced that the error was harmless beyond any reasonable doubt. Neither party is entirely correct.

This dispute arises largely because of the unusual posture of the case. In Perry's direct appeal, he argued, first, that the trial court erred in permitting further reference to and evidence regarding the tape and in failing to instruct the jury to disregard all prior testimony regarding the tape. As noted above, his argument was premised, in part, on the mistaken assumption that the tapes had not yet been admitted into evidence when he made his wiretap law objection. Recognizing, nonetheless, the lurking problem of waiver or non-preservation, Perry argued, alternatively, that counsel's failure to make a timely objection to the evidence amounted to Constitutionally ineffective assistance of counsel.

Although the two arguments are independent and quite different—one involving a statutory rule of evidence and the other the State and Federal Constitutional rights to the assistance of counsel—we considered them together. As to the issue of admissibility, we noted that, ordinarily, that issue would be resolved at a pre-trial suppression hearing at which each of the parties would have the opportunity to present the relevant facts and argument, that, because no such hearing was held, the parties did not have that opportunity, that the issue was complex and required further factual development, and that it would be inappropriate for us then to resolve it on the incomplete record made at trial. We determined that "in order to approach the instant matter fairly, the parties should be given substantially the same opportunity to develop a factual record, and legal arguments based thereon, in presenting and responding to Perry's belated suppression motion that they would have enjoyed in presenting and responding to a pre-trial suppression motion." *Perry, supra,* 344 Md. at 226, 686 A.2d at 287.

For much the same reason, we rejected Perry's invitation to resolve the ineffective assistance of counsel argument in the

direct appeal. As to that also, we noted "the lack of fact-findings bearing on whether there was a violation and whether it was willful." *Id.* at 227, 686 A.2d at 287. Accordingly, we made clear that our affirmance of the judgment was without prejudice to Perry's raising on post-conviction review *both* his contention that the evidence should have been excluded under the Maryland wiretap law and his complaint, if that contention were held to have been waived or not otherwise preserved, that counsel was ineffective in not making a more timely objection.

The post-conviction court, unfortunately, seemed to lose sight of the fact that both issues were before it, the second dependent on the first, and that led it, erroneously, to conclude that the harmless error standard of *Dorsey* "is not appropriate in a post-conviction proceeding." The court did not believe that it had "the power to reverse the trial court for an alleged error of law," and thus, although it conducted the suppression hearing, it said that it did so merely "to determine whether an error was committed by trial counsel sufficient to support a claim of ineffective assistance of counsel under the guidelines of *Strickland* and *Oken.*"

The Post Conviction Procedure Act is not limited to claims of ineffective assistance of counsel. Maryland Code, Article 27, § 645A(a)(1) permits a person convicted of a crime and either incarcerated or on parole or probation, who claims that the sentence or judgment was imposed in violation of the Federal or State Constitution or the laws of this State, to institute a proceeding under the Act. Under that provision, a host of issues arising from alleged trial error are within the purview of the Act. *See, for example, Jourdan v. State,* 275 Md. 495, 341 A.2d 388 (1975) (claim of double jeopardy); *Austin v. Director,* 237 Md. 314, 206 A.2d 145 (1965) (evidence seized pursuant to unlawful arrest); *Cherry v. State,* 305 Md. 631, 506 A.2d 228 (1986) (denial of right to make closing argument); *Baldwin v. Warden,* 243 Md. 326, 221 A.2d 73. 243 Md. 326, 221 A.2d 73 (1966) (use of perjured police testimony); *State v. Thornton,* 73 Md.App. 247, 533 A.2d 951 (1987) (guilty plea unsupported by statement of facts); *Davis*

*v. Director,* 3 Md.App. 205, 238 A.2d 573 (1968) (erroneous admission of confession). We expressly recognized that the claim of evidentiary error—the admission of the tapes and associated testimony—was within the purview of the Act when, in the direct appeal, we made clear that our affirmance of the judgment was without prejudice to Perry's raising on post-conviction review "his contention that Exhibit 312 should have been excluded under the Maryland wiretap statute."

When dealing with such a trial error issue in a post-conviction proceeding, apart from considering any applicable procedural bars, such as whether the issue was waived or finally litigated, the court undertakes essentially the same legal analysis that would be undertaken by an appellate court on direct appeal, supplemented, of course, by such additional evidence as is appropriate. The substantive issue is whether the alleged error was, in fact, committed, and, if so, whether the error was harmless. The test for harmlessness is necessarily the same as would be applied by the appellate court if the issue had arisen on direct appeal—the *Dorsey* standard of whether the reviewing court is convinced that the error was harmless beyond any reasonable doubt. The two-prong test enunciated in *Strickland,* explicated in *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), and applied by us in *Oken v. State,* 343 Md. 256, 681 A.2d 30, *cert. denied,* 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997) and *Wiggins v. State,* 352 Md. 580, 724 A.2d 1, *cert. denied,* —— U.S. ——, 120 S.Ct. 90, 145 L.Ed.2d 76 (1999) is peculiarly applicable to ineffective assistance of counsel claims arising from the Constitutional right to the assistance of counsel and has no bearing on direct claims of trial error. *See Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). The lesser standard of prejudice that forms the second prong of a *Strickland* analysis looks at the prejudice emanating from counsel's deficient performance, not from any error committed by the court at trial.[10]

---

10. As a practical matter, it is not often that the post-conviction court addresses a claim other than ineffective assistance of counsel. In many

■ Accordingly, we hold that the post-conviction court erred in applying a *Strickland* prejudice analysis to the issue of whether the tapes and testimony were wrongfully admitted at trial. We have determined that that evidence *was* wrongfully admitted, and the question then becomes whether that admission was harmless beyond a reasonable doubt. We conclude that it was not. The post-conviction court recognized that the 22–second tape "was an important piece of evidence." We have already described its importance, being the only direct physical evidence of contact between Horn and Perry and contradicting, in a dramatic way, their pre-trial assertions that they never spoke to one another. It was important enough for the State to have four witnesses identify the voices on the tape and to play the tape in court four times, twice during the State's closing argument. Notwithstanding the weight of the other evidence produced against Perry, we cannot conclude that the erroneous admission of the tapes and the voice-identification testimony was harmless beyond a reasonable doubt.

## D. *Was The Objection Waived?*

The issue of waiver is important. If Perry's complaint about the admission of the tapes and identifying evidence, which we have found to be valid, was not effectively waived by the failure of counsel to make a timely objection, the judgment of the trial court would have been in error and, for that reason, Perry would be entitled to a new trial. If, on the other hand, the complaint *was* effectively waived by counsel's failure to make a timely objection, the trial court's judgment

---

instances a claim of trial error will either be found to have been waived by the petitioner's failure to raise it at trial, on direct appeal, or in a prior collateral proceeding and the waiver is not excused (*see Walker v. State*, 343 Md. 629, 647–50, 684 A.2d 429, 438–39 (1996)), or, if raised and decided, it will usually be found to have been finally litigated. Ineffective assistance of counsel claims ordinarily, although not always, escape those procedural bars and therefore tend to predominate substantive post-conviction jurisprudence. That should not lead people into assuming that post-conviction remedies are necessarily limited to such claims, however, or that the standards peculiarly applicable to ineffective assistance of counsel claims apply in other contexts.

would not be in error, and Perry's quest for post-conviction relief would depend on a finding that counsel's lack of diligence, which alone caused the judgment of the trial court to stand, amounted to a State or Federal Constitutional deficiency.

When counsel first raised a wiretap law objection at trial, the court determined that the objection had been waived because (1) Perry had failed to move pre-trial to suppress the evidence, as required by Maryland Rule 4–252, and (2) the objection, in any event, came too late at trial—after the tapes had been admitted into evidence and one of them had already been played in court. On appeal, we noted the existence of CJ § 10–408(i), which allows a motion to suppress an unlawfully intercepted communication to be made "before or during the trial," and we made two preliminary comments regarding that statute. First, we held that it was not necessary for Perry to have called the court's attention to that statute in order to preserve his argument that the court should have considered his mid-trial motion. We then stated that we could not determine, on the record then before us, whether, had the court conducted a suppression hearing when the objection was made, Perry's motion would have been granted. Accordingly, we declined to address the matter further but noted that our decision not to do so was without prejudice to Perry's relying on § 10–408(i) in a post-conviction hearing. *Perry, supra,* 344 Md. at 229, 686 A.2d at 286. In acknowledging the existence of § 10–408(i), we did not suggest that it would suffice to trump the requirement of Rule 4–252, or permit a defendant to raise the issue at any time during the trial, even after the challenged evidence was already admitted and made known to the jury; we noted it only to allow its scope and function to be considered in a post-conviction proceeding.

In his petition for post-conviction relief, Perry cited § 10–408(i) in support of his argument that the trial court erred in ruling that his objection was waived because of his failure to move pre-trial to suppress the evidence. The post-conviction court never addressed that issue. Having concluded, as a matter of law, that the evidence was admissible, the court

found no need to address the issue of waiver. In this appeal, the State, in a footnote in its brief, urges that Rule 4–252, rather than § 10–408(i), applies and that the trial court's ruling was therefore correct. Its point is that the Rule "unlike Section 10–408(i), deals only with criminal trials where pretrial suppression hearings are the norm."

It is not necessary for us, in this appeal, to address the apparent conflict between Rule 4–252(a) and § 10–408, for it is clear that, even if we were to conclude that the statute prevails and that, pursuant to it, a motion to suppress an unlawfully intercepted wire communication may be made during the trial notwithstanding the failure to make such a motion pre-trial in accordance with the rule, Perry waived his right to complain by failing to make his objection when the evidence was first offered.

■ Neither party has cited to us, and we have been unable to locate, any indication in the legislative history of the statute of what, precisely, the Legislature meant when, in 1977, it amended the initial version of the wiretap bill then before it to depart from the Federal approach and to allow motions to suppress to be made "during" a trial. Although it seems clear that the General Assembly did not intend to foreclose an objection if not made before trial, as the Federal Act did, we do not believe that it intended to override well-established principles of trial procedure, one of which requires that objections to evidence be made at the time the challenged evidence is first offered. *See Martin v. State,* 203 Md. 66, 72, 98 A.2d 8, 11 (1953) (reviewing earlier cases and confirming that "one against whom evidence is offered must object as soon as the applicability of the evidence is known or should reasonably have been known to him," and that an objection not made at that time is waived). That principle is now codified in Maryland Rule 4–323(a) and its civil action and district court counterparts, Rules 2–517(a) and 3–517(a): "An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for

objection become apparent. Otherwise, the objection is waived."

The requirement of a contemporaneous objection is a necessary and salutary one, designed to assure both fairness and efficiency in the conduct of trials. A party cannot be permitted to sit back and allow the opposing party to establish its case, or any part of its case, through unchallenged evidence and then, when it may be too late for the opposing party to recover, to seek to strike the evidence. The "sporting theory" of trial does not go that far, and we do not believe that, by allowing suppression motions to be made "during" trial, the Legislature intended to introduce that pernicious element into our jurisprudence.

In this case, the trial judge found no good cause, based, at least in part, on the fact that counsel did not make his objection until the 11th day of trial—after the tapes were already in evidence and after one of them had been played for the jury. Counsel knew when they first heard the tape that it, coupled with the likely evidence of voice identifications, was an important and damaging piece of evidence, and they knew that Horn had made the recording without Perry's consent. In 1991—more than three years before counsel learned of the Horn tape—this Court decided *Mustafa v. State, supra,* 323 Md. 65, 591 A.2d 481, expressly holding that a communication intercepted in another jurisdiction, but in violation of the Maryland wiretap law, was inadmissible in a Maryland court, even if the interception was not unlawful in the jurisdiction where it was made. Both the factual and legal information necessary to support a motion to suppress the Horn tape was therefore available to counsel (and through counsel to Perry) well before the commencement of trial. Other than counsel's failure to recognize the significance of that information, there was no basis whatever for counsel, and thus Perry, to have abandoned the motion to suppress the Horn tape and wait until the tapes and at least one voice identification were already in evidence before the motion was effectively made. Accordingly, Perry's complaint over the admission of State's

Exhibits 312 and 342 and the voice-identification testimony relating to them was effectively waived, and, for that reason, the admission of that evidence was not reversible error.

### E. *Was Counsel's Performance Constitutionally Deficient?*

Perry has complained that, as a result of counsel's failure to preserve an objection to the inadmissible and prejudicial conversation with Horn, he was denied the effective assistance of counsel guaranteed to him by Article 21 of the Maryland Declaration of Rights and the Sixth Amendment to the United States Constitution. The standard to be applied in determining whether counsel's representation comported with the requirements of the Sixth Amendment is that enunciated in *Strickland v. Washington, supra,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, as more recently explicated in *Lockhart v. Fretwell, supra,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180. As we recounted that standard in *Wiggins v. State,* 352 Md. 580, 724 A.2d 1, *cert. denied,* —— U.S. ——, 120 S.Ct. 90, 145 L.Ed.2d 76 (1999), to prove a claim of Constitutionally ineffective assistance of counsel, the defendant must establish that counsel's performance was deficient and that the deficiency prejudiced the defense. To show a deficiency, the defendant must "(1) demonstrate that counsel's acts or omissions, given the circumstances, 'fell below an objective standard of reasonableness considering prevailing professional norms,' ... and (2) overcome the presumption that the challenged conduct 'be considered sound trial strategy.'" *Id.* at 602, 724 A.2d at 12, quoting in part from *Oken v. State, supra,* 343 Md. 256, 283, 681 A.2d 30, 43. To show that a deficiency prejudiced the defense, the defendant "must establish that counsel's error was 'so serious as to deprive [him] of a fair trial, a trial whose result is reliable.'" *Id.* Those principles, as stated, apply as well to Article 21—the Maryland analogue to the Sixth Amendment.

Based on counsel's uncontroverted admission, the post-conviction court found as a fact that counsel's failure to lodge a timely objection to the wiretap evidence was not a matter of

trial strategy or tactics but was instead the product of his failure to realize that Perry had a good basis for suppression—in the court's words, their "ignorance of the law." Because the court went on to conclude that Perry suffered no Constitutional prejudice from that deficiency, however, it made no finding as to whether the deficiency fell below an objective standard of reasonableness considering prevailing professional norms.

There can be little doubt in this case that the omission to move timely to suppress the evidence, the almost certain effect of which was a waiver of any objection to the evidence, satisfied that test. Counsel correctly recognized the importance of the evidence when they first learned of it; contemporaneously with their discovery of the tape, they had all of the factual and legal information necessary to support a motion to suppress it; and they were well aware of the requirements not only of Maryland Rule 4–252, requiring that a motion to suppress be made before trial, but of the requirement that a contemporaneous objection be made at trial. As we have noted several times, there was already pending a sufficient motion to achieve that result, but it was not pursued. Not until the eleventh day of trial, after the tapes had been admitted into evidence and played in open court was an objection based on the wiretap law made. Without detracting from the general competence of the attorneys involved, it is clear that their omission to pursue a timely motion to suppress this evidence fell significantly below the objective standard of reasonableness and that the first prong of *Strickland* was therefore established. *See Kimmelman v. Morrison, supra,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305.

The question of prejudice is not so facile. The essence of the ineffective assistance claim is that "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Lockhart v. Fretwell, supra,* 506 U.S. at 369, 113 S.Ct. at 842, 122 L.Ed.2d at 189 (quoting from *Kimmelman v. Morrison, supra* ). It is a high threshold, a difficult test to meet. As we pointed out in *Oken v. State,*

*supra,* 343 Md. at 284, 681 A.2d at 44, citing *Williams v. State,* 326 Md. 367, 374–76, 605 A.2d 103, 106–07 (1992), and *Bowers v. State,* 320 Md. 416, 425–27, 578 A.2d 734, 738–39 (1990), the petitioner must show "that there is a substantial possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different," although that test "should not focus solely on an outcome determination, but should consider 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Oken v. State, supra,* 343 Md. at 284, 681 A.2d at 44, quoting from *Lockhart v. Fretwell, supra,* 506 U.S. at 369, 113 S.Ct. at 842, 122 L.Ed.2d at 189.

In *Kimmelman v. Morrison, supra,* the Court dealt with a similar situation. An important item of evidence in a rape case was a bedsheet, seized from the defendant's home without benefit of a warrant, that contained semen stains and hair samples which other evidence connected to the defendant and the victim. Counsel objected at trial to admission of the bedsheet, on Fourth Amendment grounds, but, because he had not moved to suppress the evidence before trial, as required by the New Jersey equivalent of Maryland Rule 4–252, the objection was held to have been waived. Counsel contended that he was unaware of the seizure of the bedsheet until it was offered at trial, but that unawareness, suspect in itself because of certain information forwarded to him by the prosecutor, in any event stemmed from his failure to conduct any discovery. He conducted no discovery, he said, because he believed that it was the State's obligation to supply discovery without request, a belief that the Supreme Court found wholly without foundation. Morrison's conviction was affirmed, and the case reached the Supreme Court on Federal habeas corpus. The claim was ineffective assistance of counsel based on the attorney's failure to move timely to suppress the evidence arguably seized in violation of the Fourth Amendment.

In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Court held that, when a State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a State prisoner may not be granted Federal habeas

corpus relief on the ground that evidence obtained in violation of that Amendment was admitted at his/her trial. The issue presented in *Kimmelman* was whether that approach also applied to a Sixth Amendment claim of ineffective assistance of counsel when the ineffective assistance stemmed from the failure to raise or preserve the Fourth Amendment claim.

The principal holding of the Court was that *Stone* did *not* apply to the Sixth Amendment claim. The Fourth Amendment was not a trial right, but a general protection for all citizens against governmental intrusion; to prevail, the defendant need show only that the search or seizure in question was unlawful and that it violated his reasonable expectation of privacy. The right to counsel, on the other hand, is a fundamental right of criminal defendants, designed to assure fairness and the legitimacy of the adversary judicial process. The essence of an ineffective assistance claim, as noted, is that counsel's error upset the adversarial balance to the point that the trial was rendered unfair and the verdict suspect. When the incompetence rests entirely on the failure to litigate a Fourth Amendment claim, the defendant must prove not only that the Fourth Amendment claim is meritorious but, to establish the required prejudice under *Strickland,* that "there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman, supra,* 477 U.S. at 375, 106 S.Ct. at 2583, 91 L.Ed.2d at 319.

Having reached that conclusion, the *Kimmelman* Court then turned to the *Strickland* analysis. The District Court, acting before *Strickland* was decided, had granted relief by applying a *Dorsey v. State*-type of harmless-beyond-a-reasonable-doubt standard and concluding that Morrison had been prejudiced. The Third Circuit Court of Appeals, applying *Strickland,* concluded that counsel had been grossly deficient but remanded for further consideration of the prejudice issue. The Supreme Court had no difficulty on the record before it in holding that counsel's performance was Constitutionally deficient, and it was urged to rule upon the prejudice issue as well. It declined to do so, however, and affirmed the remand, noting that no evidentiary hearing had been held on the merits

of the Fourth Amendment claim, that the State was entitled to an opportunity to establish that the seizure was lawful, and that, even if it was not, Morrison "*may* be unable to show that absent the evidence concerning the bedsheet there is a reasonable probability that the trial judge would have a reasonable doubt as to his guilt." *Id.* at 391, 106 S.Ct. at 2591, 91 L.Ed.2d at 329 (Emphasis added).

Justice Powell, joined by Chief Justice Burger and then-Justice Rehnquist, filed a concurring opinion in which he posed a question not raised by the parties or addressed by the Court—whether the admission of reliable, but unlawfully seized, evidence could ever, of itself, satisfy the prejudice prong of *Strickland*. Justice Powell expressed the view that the harm suffered by Morrison "is not the denial of a fair and reliable adjudication of his guilt, but rather the absence of a windfall," and that "[b]ecause the fundamental fairness of the trial is not affected, our reasoning in *Strickland* strongly suggests that such harm does not amount to prejudicial ineffective assistance of counsel under the Sixth Amendment." *Id.* at 396, 106 S.Ct. at 2594, 91 L.Ed.2d at 333. He explained that admission of the bedsheet harmed Morrison "only in the sense that it helped the fact-finder make a well-informed determination of respondent's guilt or innocence," and, in his view, nothing in *Strickland* compelled a conclusion that such an injury establishes prejudice for purposes of the ineffective assistance claim. Powell concurred in the remand because neither the parties nor the lower courts had considered that question and because it was not encompassed in the petition for *certiorari*. *Id.* at 397, 106 S.Ct. at 2594, 91 L.Ed.2d at 334.

On remand, New Jersey decided not to contest the illegality of the seizure, but asserted Justice Powell's view that the introduction of reliable evidence can never satisfy the prejudice prong of *Strickland*, even if that evidence was inadmissible because it was unlawfully obtained. The District Court expressly rejected that argument, pointing to the statement in the majority opinion that approved of habeas corpus review of an ineffective assistance claim "where counsel's primary error is failure to make a timely request for the exclusion of illegally

seized evidence—evidence which is 'typically reliable and often the most probative information bearing on the guilt or innocence of the defendant.'" *Morrison v. Kimmelman,* 650 F.Supp. 801, 805 (D.N.J.1986) (quoting from *Kimmelman, supra,* 477 U.S. at 379, 106 S.Ct. at 2585, 91 L.Ed.2d at 322). The judge noted also that "were petitioner precluded, as a legal matter, from establishing prejudice under the facts of this case, this matter would never have been remanded to this Court for further consideration. There would have been no point to it." *Morrison, supra,* 650 F.Supp. at 805.

Addressing the prejudice issue, the court noted the importance of the bedsheet as corroborating the testimony of the victim, which was riddled with inconsistencies. Because the State essentially conceded the illegality of the seizure, the Fourth Amendment violation was established. The trial judge, it concluded, faced a close decision, and but for counsel's errors, the court found it highly probable that the evidentiary picture would have been very different. In the court's judgment, it was reasonably probable that, but for counsel's errors, the balance would have tilted in favor of Morrison's version. On that basis, which, in light of the later pronouncements in *Lockhart* may be an incorrect one, the court found prejudice in the particular case and granted the writ.

The Seventh Circuit Court of Appeals has embraced Justice Powell's view and held, expressly, that "under *Strickland* no prejudice exists when evidence gathered in violation of the Fourth Amendment is erroneously admitted at trial." *Holman v. Page,* 95 F.3d 481, 492 (7th Cir.1996). "It is inconsistent with the function of the exclusionary rule," the court held, "to permit a criminal defendant on federal habeas review to claim prejudice because but for his counsel's incompetence on the suppression issue he would have gotten away with the crime." *Id.* at 491. That is not the kind of prejudice, it said, anticipated by *Strickland.* Exclusion of the evidence does not impact on the correctness of the verdict but rather "enhances the truthfinding process by permitting the consideration of valuable probative evidence." *Id. See also United States v. Williams,* 106 F.3d 1362 (7th Cir.1997); *Spreitzer v. Peters,*

114 F.3d 1435 (7th Cir.1997); *United States v. Jones,* 152 F.3d 680 (7th Cir.1998).

To the best of our knowledge, the Seventh Circuit stands alone in that approach. The Eleventh Circuit Court of Appeals has taken an opposite approach. In *Van Huynh v. King,* 95 F.3d 1052 (11th Cir.1996), a State prisoner complained on Federal habeas corpus about the failure of his trial counsel to move timely to suppress evidence seized from his wallet at the time of his arrest. Counsel claimed that the decision not to file a pre-trial motion was strategic; his goal was to create an appellate issue. Accepting that argument, the District Court denied relief. The Court of Appeals disagreed with that determination and held that counsel's performance was objectively unreasonable and therefore deficient—that no reasonable attorney would forego the litigation of a meritorious claim in order to set up an issue for appeal or collateral review. It declined to address the prejudice question, however, without the benefit of the District Court's finding on the validity of the underlying Fourth Amendment claim. Recognizing that a good Fourth Amendment claim alone would not guarantee success on a Sixth Amendment claim, it nonetheless concluded that "if the district court finds that Huynh's Fourth Amendment right was violated and as a result that, had counsel filed a motion to exclude this evidence, it likely would have been granted, then Huynh was prejudiced by his lawyer's unreasonable performance as a matter of law." *Van Huynh,* 95 F.3d at 1058. That determination, obviously, is a rejection of the notion that failure to pursue a Fourth Amendment claim can never be prejudice under *Strickland.*

The California Supreme Court also has rejected, at least implicitly, the notion that counsel's failure to move to suppress reliable evidence can never constitute *Strickland* prejudice. In *In re Neely,* 6 Cal.4th 901, 26 Cal.Rptr.2d 203, 864 P.2d 474 (1993), the court had before it a habeas corpus petition based on the failure of trial counsel to move to suppress a tape of an incriminating conversation between the defendant and a State agent instigated by the State while the defendant was represented by counsel, and thus in violation of *Massiah v. United*

*States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The court found both deficient performance and prejudice. As to the latter, the court concluded that there was a reasonable probability that had the tape recording been suppressed, the outcome with regard to guilt would have been more favorable to the defendant, and it therefore granted the writ. The majority opinion did not discuss Justice Powell's view but simply acted inconsistently with it. In a concurring opinion, however, Justice Arabian took note of Justice Powell's view and, though sympathetic with that view, nonetheless rejected it as a statement of current law, observing that "[a] holding that prejudice has not been shown for these reasons would effectively render meaningless the majority opinion in [*Kimmelman* ] and would run counter to broad language found in that opinion." *Id.,* 26 Cal.Rptr.2d 203, 864 P.2d at 488.

We cannot, of course, predict how the Supreme Court might ultimately resolve this question in the context of the Sixth Amendment, but, with all due respect to Justice Powell, the concurring Justices, and the Seventh Circuit Court of Appeals, we reject as a matter of independent Maryland law under Article 21 of the Declaration of Rights the notion that a defendant is never prejudiced under a *Strickland*-type analysis when reliable, though legally inadmissible, evidence is admitted against him or her.[11] The issue in a Sixth Amendment/Article 21 context is not the scope, function, or reach of

---

11. We have traditionally regarded the right to counsel guaranteed under Article 21 as being the same right provided by the Sixth Amendment, and, in construing Article 21, we have followed and applied the decisions of the Supreme Court interpreting the Federal provision. *See State v. Tichnell,* 306 Md. 428, 440, 509 A.2d 1179, 1185, *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986) ("There is no distinction between the right to counsel guaranteed by the Sixth Amendment and Art. 21 of the Maryland Declaration of Rights...."); *Lodowski v. State,* 307 Md. 233, 513 A.2d 299 (1986); *Harris v. State,* 303 Md. 685, 496 A.2d 1074 (1985). In the context of ineffective assistance claims raised in post-conviction proceedings, we have therefore tended to focus on the Sixth Amendment jurisprudence, even when the claim is based on Article 21 as well, and, as a result, have applied a *Strickland/Fretwell* analysis to those claims. *State v. Colvin,* 314 Md. 1, 23–24, 548 A.2d 506, 517 (1988). We do so in this case as well.

the exclusionary rule, whether judicially designed to protect a Constitutional right or created by the Legislature to protect a statutory one, but whether the defendant received the effective assistance of counsel. Nor is it a matter of an inappropriate "windfall." The most fundamental underpinning of our criminal justice system, upon which most, if not all, other rights rest, is that a defendant is presumed to be innocent, and it is the obligation of the State to prove guilt, upon proper procedure and by admissible evidence, beyond a reasonable doubt. It is not a "windfall" when counsel succeeds in suppressing evidence that, for whatever reason, is inadmissible. That is precisely what counsel is there to do—to make the State prove its case by legally admissible evidence. It is difficult for us to comprehend either a logical or a practical basis for a conclusion that the defendant is not prejudiced, as a matter of law and without regard to any other circumstance, when counsel fails in that very basic responsibility.

---

With respect to the particular issue now in point, however, there is no controlling Supreme Court precedent supporting the Seventh Circuit Court's ruling. The issue is therefore an open one, both as a matter of Maryland law and, indeed, as a matter of Federal law outside the Seventh and Eleventh Circuits. In *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983), the Supreme Court held that "[i]f a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached." *See also Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). For the reasons noted in this Opinion, we do not believe that the Seventh Circuit Court's approach represents current Federal law, outside the Seventh Circuit, but even if it does, we make the "plain statement" that, for purposes of interpreting Article 21, the holdings of the Seventh and Eleventh Circuit Courts are being used for guidance only and do not themselves compel the result we reach here. The conclusions announced in this Opinion on this issue constitute our construction of the independent Maryland Constitutional provision. If the Supreme Court were to rule upon the issue, we obviously would be bound by its judgment when interpreting the Sixth Amendment, and we certainly would give due and respectful consideration to it in any future construction of Article 21, but it would not serve, on its own, to alter the declaration made in this Opinion regarding Article 21.

Our focus, therefore, under the Sixth Amendment and, independently, under Article 21, must be on whether the admission of the tape recording and the voice-identification testimony relating to it "so upset the adversarial balance between defense and prosecution that the trial was unfair and the verdict rendered suspect." *Lockhart v. Fretwell, supra,* 506 U.S. at 369, 113 S.Ct. at 842, 122 L.Ed.2d at 189 (quoting from *Kimmelman, supra* ); whether, as noted in *Oken,* "there is a substantial possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different." As we have indicated several times, this evidence was extremely important. It affirmatively and persuasively established contact between Horn and Perry and, depending on how the jury interpreted the message, may have proved contact on the very morning the murders were committed. The fact that the post-conviction court did not believe that the tape captured that particular conversation is irrelevant; the prosecutor suggested that prospect to the jury and, although the conversation is certainly ambiguous, that suggestion was by no means a frivolous one. It is true, of course, that there was a great deal of other, documentary evidence from which contact *could* have been found, but, other than the testimony of Thomas Turner given under a grant of immunity, most of it was circumstantial—calls from pay telephones with no direct proof of who the caller was. Absent proof of contact with Horn, there was little or no evidence connecting Perry either with the murders or with any of the victims. Why would a stranger from Detroit want to break into a home in Maryland and murder its occupants, including a helpless child? To establish why, the prosecutor played the tape for the jury four times during the trial, twice during his closing argument.

It is always a judgment call in determining whether a circumstance sufficed to render the verdict unreliable. In this case, we conclude, under both the Sixth Amendment and, independently, under Article 21, that it did, and, for that reason, shall reverse the judgment of the post-conviction court and remand for the court to order a new trial for Perry.

JUDGMENT REVERSED; CASE REMANDED TO CIR-
CUIT COURT FOR MONTGOMERY COUNTY FOR EN-
TRY OF ORDER IN CONFORMANCE WITH THIS OPIN-
ION; MONTGOMERY COUNTY TO PAY THE COSTS.

Dissenting Opinion by RODOWSKY, J., in which ROBERT
L. KARWACKI (retired, specially assigned), JJ., joins in.

RODOWSKY, Judge, dissenting:

I respectfully dissent because, as the circuit court found at
the post-conviction hearing, the interception by Horn of the
telephone conversation with Perry was inadvertent and not in
violation of the Maryland wiretap statute.[1]

In my opinion the legal analysis is straightforward. Perry
contends that the 22-second tape should have been sup-
pressed. Suppression is governed by § 10–405 which in rele-
vant part reads:

"Whenever any wire ... communication has been intercept-
ed, no part of the contents of the communication ... may be
received in evidence in any trial ... if the disclosure of that
information would be in violation of [Subtitle 4]."

What constitutes a violation of Subtitle 4 by way of disclo-
sure of information contained in an intercepted wire communi-
cation is found in § 10–402(a)(2). It reads: "Except as other-
wise specifically provided in this subtitle it is unlawful for any
person to ... (2) [w]ilfully disclose ... to any other person the
contents of any wire ... communication, knowing or having
reason to know that the information was obtained through the
interception of a wire ... communication in violation of [Subti-
tle 4]."

What constitutes an interception of a communication in
violation of Subtitle 4 is found in immediately preceding § 10–

1. In this dissenting opinion references to the Maryland wiretap statute,
Maryland Code (1974, 1998 Repl.Vol.), §§ 10–401 through 10–414 of
the Courts and Judicial Proceedings Article will be indicated simply by
the prefix § 10–4, followed by the two digits identifying the particular
section of Subtitle 4, "Wiretapping and Electronic Surveillance."

402(a)(1) reading in relevant part: "Except as otherwise specifically provided in this subtitle it is unlawful for any person to ... (1) [w]ilfully intercept ... any wire ... communication." Thus, whether the content of an intercepted communication is to be suppressed turns on (excluding exceptions) whether the interception was willful.

This issue was addressed by the post-conviction court. It made the specific and ultimate fact-findings set forth below.

"The facts surrounding this case make it clear that this recording was not wilfully obtained, certainly a highly permissible inference from the facts as detailed below. The relationship between Lawrence Horn and James Perry was covered in layers of secrecy and deception. The evidence produced at the trial and the post-conviction hearing revealed the following:

"1. Telephonic secrecy—Lawrence Horn and James Perry established an elaborate plan to ensure that their telephone calls would not be traced. They utilized a calling card belonging to a Kamella McKinney, which was a false name assumed by Horn's cousin Marsha Webb. Perry and Horn would always use a pay phone to initiate a call to the other. They attempted pay phone to pay phone calls to one another, without success.

"2. Wire transfers—Over the course of the conspiracy, Lawrence Horn sent money to Perry through Western Union. In an effort to avoid any connection between him and Perry, Horn used the name of George Shaw when sending the money. George Shaw, as more fully discussed below, was a name taken from a Los Angeles Times obituary.

"3. Turner utilized—After the murders, when Perry and Horn realized that their telephones may be subject to police surveillance, they utilized Thomas Turner, as an intermediary, to set up a time and place when contact needed to be made.

"4. Horn's Deposition—Horn denied knowing James Perry during a civil deposition taken in 1994.

"5. <u>No Paper Trail</u>—During a search of Horn's residence, the police obtained thousands of pages of text that was printed from certain cassettes, disks, and the hard drive on Horn's computer. This included an address book, personal correspondence and personal notes. There was not one mention of James Perry, his phone number or his address in this information.

"6. <u>Perry's arrest</u>—When Perry was arrested he asked whether anyone else was going to be arrested or indicted that day. When told yes, and when Lawrence Horn from California was identified as the other person, Perry said he had never heard of Horn.

"The efforts by Lawrence Horn and James Perry to leave no trace of contact with each other were substantial. They went to extraordinary lengths to hide their relationship. To suggest that Horn would 'wilfully' record a conversation between himself and Perry defies logical explanation. The only rational explanation for the existence of the 22–second tape is that the conversation was inadvertently recorded. Therefore, the Maryland Wiretap and Surveillance Act would not apply.

"Based on the reasons set forth above, this court finds that Exhibit 312, even if objected to in a timely fashion, would have been admissible during the trial in this case. Accordingly, the motion to suppress is denied."

In this Court Perry did not contend that the finding of inadvertence was clearly erroneous and, in my opinion, the finding of inadvertence is a legitimate inference that the post-conviction court could draw from the evidence. The finding of inadvertence is not, in my view, rendered clearly erroneous, as the majority concludes, by the evidence of how Horn treated telephone conversations with people *other than Perry.* Indeed, the evidence of Horn's taping of calls from others suggests how it came about that Horn inadvertently intercepted a telephone call from Perry who, inferentially, was never to place a telephone call to Horn's home.

This Court's principal conclusion is that the controlling provision is § 10–407(c). Section 10–407, in general, addresses the disclosure and use of the contents of intercepted communications. Subsections (a) and (b) deal with the investigatory disclosure and use of intercepted communications by any law enforcement officer "who, by any means authorized [by Subtitle 4], has obtained knowledge of the contents of any wire ... communication." These subsections in general authorize disclosure and use "appropriate to the proper performance" of official duties of the law enforcement officers involved. Subsection (c) deals with use and disclosure as testimony and in relevant part reads as follows:

> "Any person who has received, by any means authorized by this subtitle, any information concerning a wire ... communication ... intercepted in accordance with [Subtitle 4] may disclose the contents of that communication ... while giving testimony...."

The majority concludes that the 22–second tape was acquired "by [a] means authorized by [Subtitle 4]" because it was seized under a search and seizure warrant, and I agree. I do not agree, however, that an inadvertent, and therefore non-willful interception, is suppressible under the statutory exclusionary rule of § 10–405. It is on this basis that the facts of the instant matter are distinguishable from those in *Mustafa v. State*, 323 Md. 65, 591 A.2d 481 (1991), where the interception was clearly willful. Nor do I agree that § 10–407(c) authorizes suppression on grounds that are broader than those specified in § 10–405, which may be invoked only when "disclosure of [the intercepted] information would be in violation of [Subtitle 4]."

The majority opinion departs from the rationale in *Perry v. State*, 344 Md. 204, 686 A.2d 274 (1996) (*Perry I*). On direct appeal, Perry contended that the challenged tape "was inadmissible under the legislatively created exclusionary rule" of § 10–405. *Id.* at 221, 686 A.2d at 282. To support suppression Perry relied on § 10–402(a). *Id.* at 224, 686 A.2d at 284. This Court concluded that the suppression issue was not before it on direct appeal, but could be raised on post-

conviction. *Id.* at 228, 686 A.2d at 285. In discussing the issues to be developed on post-conviction, this Court said that "the inadequacy of the record [in *Perry I*] includes the lack of fact-findings bearing on whether there was a violation and whether it was willful." *Id.* at 227, 686 A.2d at 285. This Court thereby recognized that the analysis proceeded from § 10–405 to § 10–402(a)(2) and ultimately to § 10–402(a)(1). As this Court asked the post-conviction court to do, the fact-findings have been made under the analysis in *Perry I*. The result is that the tape is admissible.

The majority adopts an analysis different from that in *Perry I*. Because Perry did not consent to the interception, the majority holds that the communication was not "intercepted in accordance with the provisions of this subtitle," as that quoted language is used in § 10–407(c) and that the result is exclusion. Essentially the majority creates a limbo between the heaven of interceptions "authorized by" or "in accordance with" Subtitle 4 and the hell of conduct "in violation of" Subtitle 4. In this limbo the majority says there dwell communications that are not intercepted in violation of Subtitle 4, because they are not willful and not subject to criminal penalty or civil liability, but are nevertheless subject to suppression because they were not "intercepted in accordance with the provisions of [Subtitle 4]." In my reading of the statute, there is but one concept bearing on admissibility, and that single concept is expressed either approvingly or disapprovingly, depending on whether the intercepted communication may or may not be used as evidence. When the communication may not be used as evidence the statute speaks disapprovingly of the "violation" of Subtitle 4. *See* § 10–405. When the communication is not in violation of Subtitle 4 and may be used as evidence, the statute speaks approvingly of the intercept and use of the communication as having been acquired by "means authorized by" or "in accordance with" Subtitle 4. *See* § 10–407(c). Insofar as admissibility is concerned there are, in my view, only two classes of interceptions under Subtitle 4: those that are in violation and those that are not in violation.

Supporting this conclusion is § 10–407(d) where the words relied upon by the majority, *i.e.*, "in accordance with the provisions of [Subtitle 4]" are used. Subsection (d) reads:

"An otherwise privileged wire, oral, or electronic communication intercepted in accordance with, or in violation of, the provisions of this subtitle, does not lose its privileged character."

In subsection (d) the phrase "in accordance with" is used in contradistinction to the phrase, "in violation of," and the combination of the two phrases clearly is intended to encompass the entire spectrum of intercepted communications. The person who enjoys the privilege does not lose it simply by virtue of an interception, of any kind, of that person's communication.

The federal counterpart to § 10–407(d) is 18 U.S.C. § 2517(4) ("No otherwise privileged wire, oral, or electronic communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character."). The federal act, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1994), was one of the subjects of Senate Report No. 1097, 90th Cong., *reprinted in*, 1968 U.S.C.C.A.N. 2112–309. The report explains the purpose of 18 U.S.C. § 2517(4). That "provision is intended to vary the existing law only to the extent it provides that an otherwise privileged communication does not lose its privileged character because it is intercepted by a stranger." 1968 U.S.C.C.A.N. at 2189.

The concern of § 10–407(d) and 18 U.S.C. § 2517(4) is interception by a stranger, and it is immaterial whether that interception is or is not a violation. To encompass *all* interceptions Congress and the General Assembly used the language "intercepted in accordance with, or in violation of." "[I]n accordance with" should be given the same meaning in § 10–407(c) as it has in the immediately following § 10–407(d). There is no limbo category.

Also instructive is *United States v. Baranek*, 903 F.2d 1068 (6th Cir.1990), an appeal by the Government from a suppres-

sion order. There, federal agents had been authorized by court order to tap the telephone of a suspected drug dealer. Someone on the dealer's premises inadvertently left the telephone in the kitchen of the dealer's residence off of the hook and not in use. Later there was a face-to face, oral conversation in the kitchen between the dealer and a co-conspirator which was carried over the open telephone and was recorded on the wiretap equipment. The District Court suppressed the conversation because there had been an oral interception, whereas the court order authorized only a wire interception. The Sixth Circuit reversed, analogizing to the plain view doctrine in search and seizure law. *Id.* at 1071. The court said that "[w]here, as here, we have a case with a factual situation clearly not contemplated by the statute, we find it helpful on the *suppression* issue (as opposed to the question of whether there was a violation of the authorization order) to look to fourth amendment law." *Id.* at 1072. In the matter before this Court, Horn's inadvertent interception of his conversation with Perry is similar to the telephone's being left off of the hook in *Baranek.* Regardless of whether one agrees or disagrees with the manner in which the government obtained the content of the conversation in *Baranek,* in the instant matter it is clear that the State's acquisition of the tape was lawful. Here, the combination of inadvertent interception, even though without the consent of all (or any) participants, coupled with lawful acquisition of the content by the State, should result in admissibility.

Also incompatible with the majority's analysis are *United States v. Vest,* 813 F.2d 477 (1st Cir.1987), and *United States v. Phillips,* 540 F.2d 319, *cert. denied,* 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976). In each of these cases, a private individual who was not acting as a government agent willfully violated the federal act by intercepting oral communications. In each case, when ruling to suppress that evidence, the appellate court followed a route that took it from § 2515 (suppression) to § 2511(1) (violation) without meandering through or finding any significance in § 2517(3) (use as testimony).

For these reasons I would affirm.

Judge KARWACKI has authorized me to state that he joins in the views expressed herein.

CATHELL, Judge, dissenting:

I respectfully dissent. Because I think *Mustafa v. State,* 323 Md. 65, 591 A.2d 481 (1991), was incorrectly decided and should be overruled, or at least distinguished from this case, I would hold that Horn's interception of phone conversations in California did not violate Maryland's wiretap statutes and I would affirm the trial court's denial of postconviction relief.[1] I also adopt the excellent reasoning of Judge John McAuliffe's dissent in *Mustafa,* 323 Md. at 76–79, 591 A.2d at 486–88.

I note, initially, that in the Court's statutory construction of the Maryland Wiretap Act in *Mustafa,* no mention was made of what I perceive to have been an important modification of the Act. In *Mustafa,* the Court opined:

It is plain that the legislative intent in the Maryland Act was to inhibit the disclosure in Maryland courts of the content of communications not intercepted *in conformity* with the public policy of this State as evidenced by the provisions of its governing law. In other words, the Maryland Act precludes the admission of a communication intercepted, no matter where, under circumstances *inconsistent* with this State's substantive law. [Emphasis added.]

*Id.* at 74–75, 591 A.2d at 485–86. That statement mirrored the language of the statute in 1973, but not the present language. The present language, I would respectfully suggest, *requires an actual violation of the Maryland Wiretap Act.*

Prior to 1977, the admissibility language stated in relevant part: "Only evidence obtained *in conformity with* the provisions of this subtitle is admissible." Md.Code (1974), § 10–406

---

1. Because the majority opinion is based on the assumption that the recording at issue was inadmissible pursuant to *Mustafa,* and I disagree with that assumption, I shall only address that matter. If the evidence was admissible, the other matters—waiver, failure to seek suppression, willfulness, inadvertence—would basically be moot.

of the Courts & Judicial Proceedings Article (emphasis added). That language was changed in 1977 to read, in relevant part: "[N]o part of the contents of the communication ... may be received in evidence ... if the disclosure of that information *would be in violation of* this subtitle." Md.Code (1974, 1998 Repl.Vol.), § 10–405 of the Courts & Judicial Proceedings Article (emphasis added).

This change in the statute was not discussed in *Mustafa*. As I view the language, the earlier prohibition could be construed (although I would not do so) as an outright prohibition requiring conformance with two-party consent, or whatever the consent standard was, or would be in Maryland. The later language, as I view it, is less prohibitory. It appears to me to state that if the acquiring of the evidence *actually violates* Maryland law, then the evidence is inadmissible. Under the earlier version, it can reasonably be argued that conformance to certain requirements must be met before the evidence is admissible. A reasonable interpretation of the change in language is that, thereafter, in order to be inadmissible, the recording must have actually violated Maryland law. I see no other logical purpose (presuming there was a logical purpose) for the change. Considering that this legislative history, sparse as it is, was not addressed in *Mustafa*, I believe the *Mustafa* Court was incorrect in its construction of the statute in the first instance.

The Supreme Court has stated that "it is common wisdom that the rule of *stare decisis* is not an 'inexorable command,' and certainly it is not such in every constitutional case." *Planned Parenthood v. Casey*, 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992).

> *Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. Adhering to precedent is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be settled right. Nevertheless, when governing decisions are unworkable or

are badly reasoned, this Court has never felt constrained to follow precedent. *Stare decisis* is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision. [Citations omitted.] [Internal quotation omitted.]

*Payne v. Tennessee,* 501 U.S. 808, 827–28, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991).

This Court has also noted that, although important, the rule of *stare decisis* is not an absolute:

[I]t is a well recognized and valuable doctrine that decisions, once made on a question involved in a case before a court, should not thereafter be lightly disturbed or set aside (except by a higher court). This is because it is advisable and necessary that the law should be fixed and established so far as possible, and the people guided in their personal and business dealings by established conclusions, not subject to change because some other judge or judges think differently.

On the other hand, it is sometimes advisable to correct a decision or decisions wrongly made in the first instance, if it is found that the decision is clearly wrong and contrary to other established principles.

*Townsend v. Bethlehem–Fairfield Shipyard, Inc.,* 186 Md. 406, 417, 47 A.2d 365, 370 (1946); *see also Hearst Corp. v. State Dep't of Assessments & Taxation,* 269 Md. 625, 643–44, 308 A.2d 679, 689 (1973) ("The doctrine of *stare decisis,* important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life." (quoting *White v. King,* 244 Md. 348, 354, 223 A.2d 763, 767 (1966))); *Greenwood v. Greenwood,* 28 Md. 369, 381 (1868) ("Previous decisions of this court should not be disturbed ... unless it is plainly seen that glaring injustice has been done or some egregious blunder committed.").

Previous decisions governing the interpretation of statutes are generally entitled to greater deference under the doctrine

of *stare decisis;* such decisions, however, must always yield to common sense. As the Iowa Supreme Court has noted:

> Generally, when a statute receives a certain judicial interpretation and is subsequently reenacted without pertinent change, such interpretation is presumed adopted or approved by the legislature.

> But the foregoing presumption is not conclusive. It stands only as one factor among many in determining legislative intent. . . .

> Neither does [the presumption] nor the pressures of stare decisis prevent our reconsideration, repair, correction, or abandonment of past judicial pronouncements, especially when error is manifest.

*Young v. City of Des Moines,* 262 N.W.2d 612, 615 (Iowa 1978) (citations omitted), *overruled on other grounds by Parks v. City of Marshalltown,* 440 N.W.2d 377 (Iowa 1989). The Appellate Court of Illinois has also stated:

> The doctrine of *stare decisis* is not an inflexible rule requiring a reviewing court to blindly follow its own precedents. While considerations of *stare decisis* weigh heavily in the area of statutory construction, especially where the legislature is free to change the court's interpretation of its legislation, a reviewing court should not decline to correct a prior interpretation which it finds erroneous . . . and a court may depart from a prior settled rule where it becomes evident that it is prejudicial to the public interest.

*Mueller v. Board of Fire & Police Comm'rs,* 267 Ill.App.3d 726, 732, 205 Ill.Dec. 304, 643 N.E.2d 255, 260–61 (1994) (citation omitted); *see also Conway v. Town of Wilton,* 238 Conn. 653, 676, 680 A.2d 242, 254 (1996) ("Our decision that we should not overrule precedent unless cogent reason and inescapable logic require it has particular force when the precedent involved concerns the interpretation or construction of a statute. There may well be precedent nevertheless that, when challenged and reexamined, mandates that '[j]udicial honesty dictates corrective action.'" (alteration in original) (citation omitted)); *Hackford v. Utah Power & Light Co.,* 740 P.2d

1281, 1283 (Utah 1987) ("As a practical matter, we can and do, on occasion, depart from a prior statutory interpretation."); *Jepson v. Department of Labor & Indus.*, 89 Wash.2d 394, 407, 573 P.2d 10, 17 (1977) ("The doctrine of stare decisis is not applicable to statutory construction when it is decided that earlier interpretations are wanting, faulty, or even wrong." (citation omitted)).

The Court initially noted in *Mustafa*, 323 Md. at 73, 591 A.2d at 485, that "[t]he exclusionary provision in § 10–405 of the Maryland [Wiretap] Act precludes the admission of evidence which was not lawfully intercepted." Our primary holding was that "the Maryland [Wiretap] Act precludes the admission of a communication intercepted, *no matter where*, under circumstances inconsistent with this State's substantive law." *Id.* at 75, 591 A.2d at 486 (emphasis added). The particular section with which the Court was concerned was section 10–402 of the Courts & Judicial Proceedings Article, which provides that any willful interception, endeavor to intercept, any willful disclosure, or endeavor to disclose or any willful use, or endeavor to use, any contents of wire, oral, or electronic communications not obtained in accordance with other provisions of the Maryland Wiretap Act, is unlawful. The Maryland statute defines violations of its requirements as felonies. *See id.* § 10–402(b).

The "exclusionary" section of the Wiretap Act provides:

**§ 10–405. Admissibility of evidence.**

Whenever any wire or oral communication has been intercepted, no part of the contents of the communication and no evidence derived therefrom may be received in evidence in any trial ... if the disclosure of that information *would be in violation of this subtitle.* [Emphasis added.]

## Discussion

"[E]avesdropping has grown more simple and yet infinitely more complex in the modern communication age." *People v. Capolongo*, 85 N.Y.2d 151, 158, 623 N.Y.S.2d 778, 647 N.E.2d 1286, 1289 (1995). As a result, many states have enacted independent wiretapping statutes governing the admissibility

of such evidence in trials. This has led to a division between states concerning standards of admissibility—some states are stricter than others. A difficult problem has developed concerning the interpretation of an individual state's wiretapping statute concerning evidence that would have been illegally obtained and, therefore, inadmissible in the forum state, but was obtained legally out-of-state.

The majority trend among our sister states is "the law that controls the legality of an interception is the law of the place wherein the *interception* takes place."[2] *United States v. Gerena,* 667 F.Supp. 911, 913 (D.Conn.1987) (quoting *United States v. Bennett,* 538 F.Supp. 1045, 1047 (D.P.R.1982));*United States v. Geller,* 560 F.Supp. 1309, 1317 (E.D.Pa.1983) (discussing *Bennett* ), *aff'd sub nom. United States v. DeMaise,* 745 F.2d 49 (3d Cir.1984), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985); *see Echols v. State,* 484 So.2d 568, 571–72 (Fla.1985) (holding that wiretap interception made in Indiana in compliance with Indiana law, but not with Florida law, was admissible in Florida court), *cert. denied,* 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 166 (1986); *State v. Bridges,* 83 Hawai'i 187, 202, 925 P.2d 357, 372 (1996) (holding that wiretap interception made in California in compliance with California law, but not with Hawaiian law, was admissible in Hawaiian court); *State v. Engel,* 249 N.J.Super. 336, 369, 592 A.2d 572, 588 (App.Div.1991) (holding that wiretap interception legally made in New York under New York law, but not legal under New Jersey law, was admissible in New Jersey court); *Frick v. State,* 634 P.2d 738, 741 (Okla.Crim. App.1981) (holding that wiretap interception in Virginia, which was in compliance with Virginia law, but not with Oklahoma law, was admissible in Oklahoma court); *Commonwealth v. Bennett,* 245 Pa.Super. 457, 462, 369 A.2d 493, 494–95 (1976) (holding that wiretap interception made in New Jersey in

---

2. I am not concerned in this discussion whether a particular state's statute is one party or all party consensual, but that the taping elsewhere while legal there by that state's standards, would have been illegal if done in the forum's state. The real issue is not consensual/nonconsenual but legal/illegal.

compliance with New Jersey law, but not with Pennsylvania law, was admissible in Pennsylvania court); *State v. Mayes*, 20 Wash.App. 184, 193, 579 P.2d 999, 1005 (1978) (holding that wiretap interception in California, which was in compliance with California law, but not with Washington law, was admissible in Washington court); 1 Wayne R. Lafave, *Search and Seizure* § 1.5(c), at 148–50 (3d ed.1996); Richard Tullis & Linda Ludlow, *Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule*, 10 U.S.F. L.Rev. 67, 90 (1975) ("If the search did not take place in the forum jurisdiction, it is apparent that the search cannot become illegal solely because the forum court makes a hypothetical determination that it would have been illegal if it had occurred in the forum."); *see also People v. Blair*, 25 Cal.3d 640, 656, 159 Cal.Rptr. 818, 602 P.2d 738, 748 (1979) (holding that telephone records collected in Pennsylvania in compliance with Pennsylvania law, but not with California law, were admissible in California state court); *Capolongo*, 85 N.Y.2d at 161, 623 N.Y.S.2d 778, 647 N.E.2d at 1291 (holding that wiretap interception made in Canada in compliance with Canadian law, did not violate New York privacy law); *People v. Fidler*, 72 Ill.App.3d 924, 926, 29 Ill.Dec. 51, 391 N.E.2d 210, 211 (1979) (holding that wiretap interception in Illinois by federal agents in compliance with federal wiretapping laws, but not with Illinois law, was admissible in Illinois state court); *Commonwealth v. Trignani*, 334 Pa.Super. 526, 536, 483 A.2d 862, 866–67 (1984) (holding that wiretap interception in Pennsylvania by federal agents in compliance with federal wiretapping laws, but not with Pennsylvania law, was admissible in Pennsylvania state court); *cf. D'Antorio v. State*, 837 P.2d 727, 731 (Alaska Ct.App.1992) (regarding introduction of evidence in an Alaskan court: "federal law and the law of Ohio apply to the search incident to arrest and the original inventory search … conducted in Ohio since the police officers who conducted these searches were Ohio police officers and were simply following Ohio law."); *McClellan v. State*, 359 So.2d 869, 873 (Fla.Dist.Ct.App.) ("[E]vidence procured in a sister state pursuant to a search valid under of the laws of that state is admissible in the trial of a criminal case in Florida notwith-

standing that the warrant validly issued and executed in the sister state would not have been or was not valid under the laws of Florida; provided the warrant and its execution in the sister state does not offend U.S. Constitutional standards."), *cert. denied,* 364 So.2d 892 (Fla.1978); *State v. Lucas,* 372 N.W.2d 731, 737 (Minn.1985) (noting that wiretap interception legally made in Wisconsin, is admissible in a Minnesota court). *See generally* Carol M. Bast, *What's Bugging You? Inconsistencies and Irrationalities of the Law of Eavesdropping,* 47 DePaul L.Rev. 837 (1998).[3]

Given the strong trend of other jurisdictions to apply the wiretap statute of the state where the wiretapping took place, this Court should overturn *Mustafa* and adopt that sounder application of the law. *Cf. United States v. Hill,* 48 F.3d 228, 232 (7th Cir.1995) ("When a number of other circuits reject a position that we have taken, and no other circuit accepts it, the interest in avoiding unnecessary ... conflicts comes into play...."); *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 876 (D.C.Cir.1992) ("[A] circuit court may reexamine its own established interpretation of a statute if it finds that other circuits have persuasively argued a contrary construction."), *cert. denied,* 507 U.S. 984, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993).

This interpretation of the law is in keeping with the tenets of the exclusionary rule and what I believe must have been the intention of the General Assembly. This Court's interpretation of the law in *Mustafa,* 323 Md. 65, 591 A.2d 481, is, I respectfully suggest, critically flawed.[4] By looking to our

---

**3.** My research indicates that there are ten states, including Maryland, that require consent of all parties to an intercepted telephone communication. They include Connecticut, Delaware, Florida, Illinois, Massachusetts, Michigan, Montana, New Hampshire and Pennsylvania. In addition, California and Washington require such consents in civil cases. At least Florida, Illinois, Pennsylvania and Washington have been presented with the same issue that exists in this case. Those four states have adopted a position consistent with the dissent.

**4.** At the very least, however, the facts of the case *sub judice* can be distinguished from *Mustafa.*

sister states, I have found what I perceive to be more logical, rational, and practical solutions and propose that we follow their lead with a similar interpretation of Maryland's wiretap statute. When an interception has been legally obtained in a situs state, it should then be admissible in Maryland regardless of whether the wiretap would have been illegal had the recording been made in Maryland. If we were to do so, we would avoid absurd results.

In statutory construction, absurd results are to be avoided. This Court stated in *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990), that "construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided." *See also, e.g., Degren v. State*, 352 Md. 400, 418, 722 A.2d 887, 895 (1999) ("[W]e should construe the statute in a manner that results in an interpretation 'reasonable and consonant with logic and common sense.'" (quoting *Lewis v. State*, 348 Md. 648, 654, 705 A.2d 1128, 1131 (1998))); *Edgewater Liquors, Inc. v. Liston*, 349 Md. 803, 808, 709 A.2d 1301, 1303 (1998) ("[W]e approach statutory construction from a common sense perspective."); *Lewis*, 348 Md. at 662, 705 A.2d at 1135 ("We shall not interpret a statute to produce unusual or extraordinary results, absent the clear legislative intent to enact such a provision."); *Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985) ("[R]ules of statutory construction require us to avoid construing a statute in a way which would lead to absurd results."); *Comptroller v. Fairchild Indus., Inc.*, 303 Md. 280, 284, 493 A.2d 341, 343 (1985) ("A statute should not be construed by forced or subtle interpretations. . . ."). *Mustafa*'s holding is precisely what these cases and others seek to prevent—an unusual interpretation of a statute lacking, in my view, substantial logical force, which, in the case now before this Court, results in a great injustice.

The application of *Mustafa*'s holding to the case *sub judice* leads to this result: a telephone conversation received in California by a California resident, and legally recorded there, from a resident of the State of Michigan who is only temporarily in the State of Maryland under a contract with the

California resident to murder the California resident's disabled son and estranged wife (both of whom *are* Maryland residents), may not be admitted as evidence in Maryland. As a result, a Michigan murderer hired by a California co-conspirator is to have his conviction for murdering three Maryland residents reversed.

In all due respect, I am unable to describe the result of *Mustafa*'s application in this case as anything other than absurd—or an equivalent description. If the intention of the Legislature in passing this legislation was to protect the privacy of Maryland residents, I fail completely to perceive how the victims' privacy has been, or is being, protected. They are the only Maryland residents involved. Regrettably, they have been murdered. The ultimate invasion of privacy has already been visited on them by the murderer whose conviction is being reversed. In my view, it is difficult to believe that the General Assembly, in its wildest dreams, ever intended such a result. The result appears to be extreme, if not bizarre.

Moreover, the language of the Maryland Wiretap Act is clear and unambiguous, and needs no further construction. There is no indication that the interception of the twenty-two second conversation was illegal under California law and it apparently is legal under federal law. *See* 18 U.S.C. § 2511 (1994 & Supp. IV 1998), Cal.Penal Code §§ 632, 633.5 (West 1999). Therefore, when Horn recorded the conversation at issue here it was not unlawful where made and was not a violation of Maryland Law. He had not violated any Maryland statute. He could not have been independently prosecuted in Maryland for a violation of the Maryland statute, unless this Court is going to hold that it has the power to declare such actions done in other states, even in other countries, to constitute Maryland criminal offenses.[5] Moreover, the disclo-

---

5. There may be instances where certain types of offenses committed elsewhere may have effects in this state, and thus may, under certain limited circumstances, constitute offenses of Maryland's criminal laws.

sure of the recording in California, after it had been seized by a California officer pursuant to a valid California warrant, did not violate any Maryland law, or any California law, as far as the record establishes. There has been absolutely no *violation* of the Maryland Act and, accordingly, I fail to perceive why the evidence must be excluded pursuant to an exclusionary provision that excludes evidence only if obtained *in violation* of the statute. Additionally, we should look to the purpose of our wiretapping exclusionary rule. As we have previously stated, "[t]he purpose of these exclusionary rules is 'to deter law enforcement officers from violating privacy rights by ensuring that the courts do not become partners in illegal police conduct.'" *Mustafa*, 323 Md. at 73, 591 A.2d at 485 (quoting *Sanders v. State*, 57 Md.App. 156, 167, 469 A.2d 476, 482, *cert. denied*, 299 Md. 656, 474 A.2d 1345 (1984)). There has been absolutely no illegal police conduct in this case.

The Hawaii Supreme Court provides a practical approach to interpreting wiretap statutes. In *Bridges*, 83 Hawai'i 187, 925 P.2d 357, the Honolulu Police Department worked in concert with the La Habra, California, Police Department in conducting a sting operation on a criminal drug ring that was based in California, but conducting drug transactions in Hawaii. The police investigation resulted in numerous taped recordings of the defendants discussing the drug transactions to undercover police. The recordings were taken in California in compliance with California law. However, the law concerning wiretapping is stricter in Hawaii, and if the recordings had been made in Hawaii, they would not have been in compliance with Hawaii's more stringent requirements.

Bridges argued that because the recordings were not obtained in compliance with Hawaii's wiretapping statute, the taped evidence should be suppressed. The Hawaiian Supreme Court disagreed in a well-reasoned opinion, and noted that the purposes underlying the exclusionary rule were to (1) promote judicial integrity; (2) protect individual privacy; and (3) deter

---

Murder, and I would suggest, wiretap statutes, generally are not of that nature.

illegal police conduct, none of which would be served by excluding the wiretap evidence in that case. *See id.* at 195, 925 P.2d at 365. I propose a similar rationale.

### Judicial Integrity

"The 'judicial integrity' purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution." *Id.* at 196, 925 P.2d at 366. The question before us, therefore, is whether the evidence was obtained illegally. As I indicated, *supra,* "the law that controls the legality of an interception is the law of the place wherein the *interception* takes place." *Gerena,* 667 F.Supp. at 913 (quoting *Bennett,* 538 F.Supp. at 1047). Generally, whether the given conduct is legal is governed by the laws of the jurisdiction in which that conduct was performed. In the case *sub judice,* the telephone conversations were taped in California, a state which allows wiretap interception with one-party consent in respect to the admissibility of evidence in criminal prosecutions.[6] Thus, the evidence in this case was obtained in compliance with California law. Under the general rule of *lex loci actus,*[7] the admission of this taped evidence obtained in California would not possibly cause a loss of judicial integrity in a Maryland courtroom. To contend otherwise is, I respectfully suggest, not rational.

This analysis ties into the determination of what is the appropriate scope of Maryland's wiretap statute. With all due respect, I believe it is nonsensical for this Court to grant this statute such extraterritorial application. Nowhere in the wording of this statute does it say that a wiretapped conversation, legally obtained in another state, will be inadmissible in a Maryland court. Given the general wording of the statute

---

**6.** The California statute requires two-party consent for intercepted conversations in civil trails but has a less strict standard for criminal trials. *See* Cal.Penal Code § 633.5; Bast, *supra,* at 927 app. B.

**7.** *Lex loci actus* is defined as "[t]he law of the place where the act was done." *Black's Law Dictionary* 911 (6th ed.1990).

addressed only to *violations* of the Maryland statute, this court should hold that it was the General Assembly's intent to prohibit only wiretap evidence that was obtained illegally. If the evidence was obtained in another state, in compliance with that state's wiretapping laws, there has been no violation of any state's law, including Maryland's. Under those circumstances, where there has been no illegal conduct and the Maryland statute has not been *violated*, the evidence should be admissible in a Maryland court. That the evidence would have been illegally obtained and inadmissible under the Maryland wiretapping statute had it been taped in Maryland, should not be enough to exclude the evidence when it was not taped in Maryland. Therefore, evidence should be admissible if it is lawfully obtained in the state of interception—which it was in the case *sub judice.*

The evidence at issue was obtained in compliance with California law and no relevant Maryland statute applies extraterritorially to govern the *legality* of the acquiring of that wiretap evidence. The interception of the conversation was not illegal and, therefore, no police agency anywhere, particularly no Maryland police entity, is profiting from any unlawful conduct. I suggest that admitting the taped conversation in the case *sub judice* would not compromise the integrity of the courts. The majority's interpretation of the statute in *Mustafa* simply went too far. In this case, no statute of any jurisdiction was violated.

### Individual Privacy

Clearly, an essential purpose behind Maryland's wiretapping statute is the protection of individual privacy. As the United States District Court for the District of Connecticut has said:

In challenging the Government's surveillance operations, the defendants seek the preservation of their civil liberties and the vindication of their rights in the event of any violation. Within this context, the scope of the defendants' rights, as they might expect to exercise them on a day-to-day basis, is to be found within the realm of [the situs's *circuit*] jurispru-

dence. Ordinarily, it would be the courts of that jurisdiction that would protect the defendants' interests and provide a civil remedy for any redressable wrong.... [A] defendant, in challenging the legality of any given electronic surveillance activity, would generally expect to look to the laws of the jurisdiction where the surveillance occurred to protect his or her privacy rights....

*Gerena,* 667 F.Supp. at 917; *see also Bridges,* 83 Hawai'i at 199, 925 P.2d at 369.

When considering its holding in *Trignani,* the Pennsylvania Supreme Court took a logical stance in considering the privacy of its individual citizens:

In reaching our decision, we have carefully considered the negative implications of wiretapping and we are aware of its potential encroachment upon our citizens' cherished right to privacy. While the constitutional rights of all citizens must be zealously guarded, we believe that a delicate balance between those rights and effective law enforcement can be maintained. Clearly, our Legislature did not intend that we have an anti-wiretap law to safeguard communications among criminal networks; it was concerned with intrusions on the right of privacy of law-abiding citizens.

*Trignani,* 334 Pa.Super. at 536, 483 A.2d at 867.

It, in my view, could not have been the intention of the Legislature to provide protection to a person whose only tie to Maryland is that he committed the contract murders of Maryland residents (a handicapped child, and that child's mother and nurse).

Two-party consent provides unwarranted protection. Participant taping should be allowed, especially where the tape captures evidence of substantial harm to one of the participants, as in *Inciarrano [v. State,* 447 So.2d 386 (Fla.Dist.Ct. App.1984), *rev'd,* 473 So.2d 1272 (Fla.1985) ] [8] and

---

**8.** "In 1982, a Florida business man, Michael Anthony Phillips, taped his conversation with his business associate, Anthony Paul Inciarrano in Phillips's office. The tape contained their conversation, the sounds

*LaSane.*[9]

Bast, *supra,* at 911.

Perry was not a resident of Maryland. His sole purpose for being in state was to commit a contract murder. Surely, it was not the intent of the Legislature to extend the scope of the wiretapping statute to protect the privacy of nonresident contract murderers. The interception in question was conducted in California. Neither Perry's nor Horn's Maryland expectations of privacy were impaired under the facts of this case as the right should be limited to the laws of the location where the interception took place. Perry called Horn in California. He knew his conversation was being received in California. He knew or should have known that if his conversation was going to be intercepted or taped, it could be done in California. Thus, he knew, or should have known, that his expectation as to his right to privacy might be controlled by the laws of the jurisdiction to which he placed his calls— California. *See Blair,* 25 Cal.3d at 656, 159 Cal.Rptr. 818, 602 P.2d at 748; *Engel,* 249 N.J.Super. at 369, 592 A.2d at 588. In the instant case, the evidence at issue was obtained in California, in compliance with California law. Therefore, admitting evidence in this case would not offend the individual privacy rationale of Maryland's oral communication interception exclusionary rule.

---

of a gun firing and Phillips groaning and falling to the floor. The tape was the only evidence against Inciarrano. Although Inciarrano acknowledged it was his voice on the tape, he moved to suppress the tape because the taping was illegal; Florida requires all parties to consent to the recording and penalizes an unconsented-to recording as a third-degree felony."

Bast, *supra,* at 838 (footnotes omitted). Under the majority's holding, and under *Mustafa,* that recording would not be admissible in Maryland even though it was ruled admissible in Florida.

9. Police found a tape inside murder victim Kathleen Weinstein's pocket in 1996. The tape contained a taped forty-six minute conversation with one of her students Michael LaSane, which led to his arrest for her murder. The taped conversation was legal under New Jersey's wiretapping statute, which requires only one person to consent. Bast, *supra,* at 837–38. Under the majority's holding and under *Mustafa,* that recording would not be inadmissible in Maryland.

## Deterrence of Illegal Police Conduct

"The purpose of the exclusionary rule is to deter law enforcement officers from violating the constitutional rights of citizens by removing the incentive for disregarding such rights." *Fidler*, 72 Ill.App.3d at 926, 29 Ill.Dec. 51, 391 N.E.2d at 211; *see Mustafa*, 323 Md. at 73, 591 A.2d at 485; *see also Blair*, 25 Cal.3d at 655, 159 Cal.Rptr. 818, 602 P.2d at 748; *Engel*, 249 N.J.Super. at 368, 592 A.2d at 587; *Capolongo*, 85 N.Y.2d at 164, 623 N.Y.S.2d 778, 647 N.E.2d at 1293 ("[O]ne State's laws have no deterrent effect on conduct of governmental agents of another jurisdiction."). As the Supreme Court of Hawaii has summarized:

"Deterrence" refers to our expectation that after evidence is suppressed based on particular police conduct in one case, in the future, police officers will refrain from that type of conduct and will instead act in a manner that would not lead to suppression of evidence. . . .

Most authorities recognize that suppression of evidence in the forum state will have little, if any, deterrent effect on agents of the situs state conducting investigations within the situs state. . . .

The lack of any deterrent effect is particularly apparent when the manner in which the evidence was obtained did not violate situs law but would have violated forum law had the evidence been obtained in the forum state.

*Bridges*, 83 Hawai'i at 199, 925 P.2d at 369.

There are numerous jurisdictions that have followed an interpretation of admissibility of out-of-state wiretap evidence in the fashion I propose. Our neighboring state of Pennsylvania was first confronted with this issue in *Bennett*, 245 Pa.Super. 457, 369 A.2d 493. In that case, the Superior Court of New Jersey authorized a wiretap on a telephone located in the state of New Jersey as part as a drug investigation. The surveillance of this telephone was conducted entirely in New Jersey; however, the incoming calls, which discussed illegal drug transactions, were received from Pennsylvania. Based on this information, Pennsylvania police secured a search

warrant for the location where the incoming calls were made. The Pennsylvania Superior Court noted that

> [i]t is, of course, obvious that the courts of this Commonwealth have absolutely no power to control the activities of a sister state or to punish conduct occurring within that sister state. The legislature of New Jersey has determined that wiretapping, in appropriate circumstances and for proper cause shown, will be permitted within its borders. Thus, the information involved in the appeal before us was obtained by the New Jersey Police under a legal authorization. A conclusion that denies the exchange of information between law enforcement agencies of our Commonwealth and those of our sister states cannot be justified. The overriding public policy must . . . favor the interest of the public by fostering its protection through the detection and apprehension of those who persist in defying our laws. This is particularly true in the case of major interstate drug dealers whose activities wreck the lives of so many people in this country today. We certainly must extend to all people the protection of constitutional safeguards, but to extend such protection, on the instant facts, would be an unwarranted extension allowing procedure to emerge victorious over justice.

*Id.* at 460–61, 369 A.2d at 494. The same can be said with regard to tapes legally obtained in California used in a Maryland court in a case of contract murder by a Michigan resident. Suppressing such evidence does not promote the reasoning behind the deterrence factor.

In *Lucas*, 372 N.W.2d 731, a case strikingly similar to the case *sub judice*, the Supreme Court of Minnesota ruled on the admissibility of wiretaps obtained out-of-state in a "killing for insurance" scheme. The court stated, as to taped conversations, that "where the seizure of evidence was valid under the law of the place where the search occurred but where it would be regarded as unlawful if it had occurred in the forum state[,] . . . the forum state should not suppress it. . . ." *Id.* at 736–37.

Another factually similar contract murder case was decided by the Supreme Court of Florida in *Echols v. State*, 484 So.2d 568 (Fla.1985). In that case, the defendant was contracted by Alex Dragovich to murder Waldamar Baskovich to get control of the victim's estate. The murder occurred in Clearwater, Florida; however, a bulk of the investigation took place in Gary, Indiana. In Indiana, a police informant wore a wire with a small hidden tape recorder and questioned Echols about the murder in Florida. Echols boastfully responded that he had participated in the murder. When Florida prosecutors attempted to use the taped conversation against Echols, he argued that although the tape would be admissible under Indiana law, Florida law, the law of the forum, should apply, which would render the tape inadmissible. The Florida Supreme Court disagreed and held that:

> Florida's interests are [not] served by excluding relevant evidence which was lawfully obtained in Indiana in conformity with the United States Constitution and Indiana law. The primary purpose of the exclusionary rule is to deter future official police misconduct. We do not believe exclusion of the evidence would have any discernable effect on police officers of other states who conduct investigations in accordance with the laws of their state and of the United States Constitution. Further, we do not believe that the interest of Florida is served by *imperially* attempting to require that out-of-state police officials follow Florida law, and not the law of the situs, when they are requested to cooperate with Florida officials in investigating crimes committed in Florida.

*Id.* at 571–72 (emphasis added) (citations omitted).

Perry was a resident of Detroit, Michigan; Horn was then residing in Los Angeles, California. There was substantial, albeit circumstantial, evidence that the conspiracy to murder Horn's son and wife was conceived in substantial part while the co-conspirators were in Michigan and California. While in Michigan, Horn complained to a cousin, who was a friend of Perry's, about his problems with his relationship with Mildred Horn. The cousin told him of Perry and assisted Horn in

contacting Perry. After the murders, the cousin in Michigan continued to facilitate the relationship between Perry and Horn. Before and after the murders, there were numerous telephone calls between pay phones near where Perry was living in Michigan to Horn's phone in California, and from pay phones in California to Perry in Michigan. Additionally, $6,000 believed to be payment, or partial payment, for the murders was transferred under a fictitious name from Los Angeles, where Horn was then staying, to Perry's girlfriend in Michigan.

Presuming that California's conspiracy laws are similar to Maryland's, the application of *Mustafa*'s holding to the case at bar could result, should California choose to try Horn for conspiracy to commit murder, in the recording being admissible in the state where the conspiracy to commit the crime was made and where the recording was lawfully made, but not in the jurisdiction where the murders were actually committed. I respectfully suggest that such a result would also be absurd.

Under *Mustafa,* a criminal conspirator in Illinois, who has never been in Maryland, who records, without the co-conspirator's knowledge, a telephone conversation from the co-conspirator in California, who also has never been in Maryland, violates the Maryland Wiretap Act at the time the recording is made. This is because the exclusionary clause relied on in *Mustafa* excludes only evidence obtained and/or disclosed in violation of the Maryland statute, and the Court held in *Mustafa* that acts committed elsewhere violate the Maryland statute for exclusionary purposes. To me, this makes little sense and, as this case evidences, is unsound in practice and, as I view it, incongruous.

Under *Mustafa,* a recording of a communication from Cape Canaveral, made by an astronaut standing on the surface of the moon, recorded without NASA's consent, would not be admissible in Maryland's courts because it would violate the Maryland Act if the parties had been in Maryland. Because violations of the Maryland Act are felonies, is the astronaut a

felon? I hasten to indicate that I consider this example to be absurd; but that is the point.

The Maryland Wiretap Act also contains civil liability provisions similar to the criminal liability provisions. Section 10–410 provides in relevant part:

(a) *Civil liability.*—Any person whose ... communication is intercepted, disclosed, or *used in violation of this subtitle* shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and be entitled to recover from any person:

(1) Actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(2) Punitive damages; and

(3) A reasonable attorney's fee and other litigation costs reasonably incurred. [Second emphasis added.]

If *Mustafa*'s holding were to be extended to these civil penalty provisions,[10] persons in other states and countries receiving and recording calls made from Maryland, could be subjected to civil liability in Maryland courts, even though their state's statutes permit the recording upon the receiving party's consent. In my view, that, too, would be absurd.

Under *Mustafa,* conversations between callers in different states, each of which has the one-party consent standard, if recorded in a state where it is legal to do so, from a state in which it was legal to do so, would still not be admissible in Maryland courts. If the parties thereafter moved into Maryland, could the one whose conversation had, without his consent, been legally recorded elsewhere, initiate a civil suit under the Maryland statute and *Mustafa*'s extra-territorial extension of Maryland's jurisdiction? I believe that it was the intention of the Legislature to regulate the recordings of such

---

10. Both the civil provision and the criminal provision are based on the key phrase "in violation of this subtitle." Accordingly, the *Mustafa* rationale might apply equally in civil cases.

messages when the recording is done in this State, not else-where in the universe.

Moreover, what wrong does this type of extraterritorial application of the exclusionary rule address? In a case such as this, no agent of this State has done anything wrong. If the exclusion of the evidence is designed to "punish" the State, for what is the State being punished? It has not done anything wrong. Is the purpose to teach a lesson to the police and residents of California? We should have no interest in California's treatment of such recordings. Moreover, their actions were legal. In this case, Horn is not the opposing party that sought the admission of the recording. Obviously, we are not punishing him. What purpose does the extension of *Mustafa* serve? To whom are we teaching a lesson? Certainly not Horn. Certainly not California. Certainly not the police involved in the case.

The answer to all of these questions apparently is *Mustafa.* I believe in the importance of precedent and *stare decisis;* but, where adherence to the holdings of prior cases leads to the reversal of the convictions of a Michigan contract killer who has murdered three Maryland residents, including the California co-conspirator's own disabled child, because the co-conspirator legally recorded a telephone message in Califor-nia, the price of the precedent is too great for my adherence. *Mustafa* should be overruled.

If not overruled, it should be distinguished. While the Maryland police officer supervising the paid informant in *Mustafa* asserted that he did not know that the informant was taping the calls in the District of Columbia where it was legal to do so, the informant was, nonetheless, actively participating as an agent of the officers in attempting to have a drug transaction take place in Maryland. The State had agreed to pay $2,500 to the informant if the informant would set up the drug buy. The informant enticed Mustafa's co-defendant, Andarge Asfaw, into helping set up a drug transaction. The attempts to set up the transaction took place by phone be-tween the informant's Washington residence and Prince

George's County. The informant taped the calls, which was legal in the District.

The person taping the calls in *Mustafa* was acting at the general direction of the Maryland officers. At least to some significant extent, the informant, in respect to the specific investigation, was acting as an agent of the police, although the informant was not within the physical jurisdiction of this State.[11] *Mustafa*, therefore, involved extraterritorial Maryland police action, in direct support of a Maryland police investigation. At least an argument could be made in *Mustafa* that a Maryland police officer was being penalized, being taught to keep better control over his paid informant. In the case *sub judice*, the recording was not made as a part of a police investigation. It was made, not by an informant, but, by a co-conspirator to murder, and the recording itself did not result from the payment of Maryland funds and was legally made in California. Assuming that the purpose of the act is to deter surreptitious recordings, who is being deterred by the exclusion of this evidence? Not the police. Not Horn. Not Perry. He is getting away with murder.

I understand the majority's adherence, under the doctrine of *stare decisis*, to *Mustafa*'s extraterritorial extension of the Maryland statute's application. As I perceive it, however, it is an example of bad cases making bad law. Now, if co-conspirators record their conversations, unknown to each other and to the authorities, no part of those conversations, if discovered, will be admissible in Maryland, even if no part of the conversations occurred in Maryland and if the recording of them elsewhere was legal. I see no justification for the application of the extreme *Mustafa* rule in this case.

---

11. The *Mustafa* Court noted that had the informant acted at the "prior direction" of the officer that interception would have been exempted from the Act's prohibitions: "[W]here a police informant ... does not act under the prior direction of an investigative or law enforcement officer when intercepting a communication, the provisions of § 10–402(c)(2) do not legalize the disclosure of that communication in a Maryland court." *Mustafa*, 323 Md. at 70, 591 A.2d at 483.